[No. 2659-3.   Division Three.   February 22, 1979.]

VALENTINO REED, *Appellant*, v. PENNWALT
CORPORATION, *Respondent*.

*Critchlow, Williams, Ryals & Schuster* and *Eugene G.
Schuster*, for appellant.

*Leavy, Taber, Schultz, Bergdahl & Sweeney* and *Crane
Bergdahl*, for respondent.

ROE, J.—Defendant Pennwalt Corporation (Pennwalt)
owns a chemical manufacturing plant. It supplies caustic
soda to Rogers of Walla Walla (Rogers), a food processing
plant, whose primary product is frozen french fries. Rogers

is not a party to this action. The caustic soda, sold in bulk to Rogers, arrives in Walla Walla via railroad tank cars or tank truckloads. Upon arrival it is transferred to bulk holding tanks with capacities up to 15,000 gallons. From the bulk storage tank, it is piped through a sealed system to tumblers where it is used in a potato peeling and washing system in diluted amounts as determined by Rogers. Rogers has exclusive control of its equipment and operation, without any past or present involvement of Pennwalt. The design of the entire potato processing system, including the machinery, purchase, repair, and replacement is exclusively Rogers'. Pennwalt was aware of the general use and function of its product in this plant. However, it had no specific knowledge concerning the potato washing operation and what amounts of residue, if any, of caustic soda would be on the potatoes as they were handled by the employees.

Processing potatoes includes peeling accomplished by bathing the potatoes in a diluted solution of caustic soda. The solution utilized by Rogers contains from 6 to 22 percent caustic soda, the balance being water. The bathing process loosens the potato peel and they are put directly into a tumbler where high pressure jets of water and the tumbling action remove the peels and wash the potatoes. They then exit the washing drum to the trim line where the employees (trimmers) trim defects from the potatoes before they are cut into french fries. This is where plaintiff worked. The trim line employees wear plastic aprons and rubber gloves. About 48 trimmers are employed at one time and the production line turnover is approximately 150 trimmers per year.

As a trimmer, plaintiff used a sharp knife to cut bad spots from the potatoes. On occasion she would cut her gloves and incur a small tear or a hole and, when the drippings from the potatoes invaded her gloves, it would burn. Presumably, she had dermatitis as a result of this contact with the caustic soda. For this injury, she sues the manufacturer, Pennwalt.

In previous years, at least annually, Pennwalt had called upon Rogers and offered safety and handling information to plant personnel. The seminars covered the use, handling and safety of chlorine and caustic soda, both of which Pennwalt shipped and sold to Rogers. Meetings were arranged through the plant supervision or operations manager of Rogers, which contacted its own employees for attendance at the presentation. This included management, supervisory personnel and crew foremen. No laborers or trimmers were invited to attend. Attendees were given product news, safety and warning posters, with a general discussion concerning Pennwalt's products. Pennwalt was not involved in implementing any safety program for trimmers. Rogers' personnel did not believe that the trim line workers had any harmful exposure to caustic soda, nor were they invited to the safety seminars. The manager felt there was no exposure absent a spillover of which there was no evidence. He testified that all of the equipment was within the exclusive control of Rogers, whose trim line supervisors attended Pennwalt's presentation. The manager did not think trace amounts of caustic soda were on the potatoes when trimmed by the employees, since he personally had trimmed barehanded without any skin problems.

The head of the plant safety committee testified that the employee in charge of the peeling process took pH readings of waste solution on a daily basis, and this was taken from the liquid on potatoes as they exited the washer. The reading was 7.4 pH and 7.6 pH; that a pH of 7.0 is neutral and 7.2 and 7.6 are average and is the approximate level of normal drinking water for Richland, Washington. Hence, he believed there was no appreciable caustic soda beyond the potato washer and thus no exposure to trim line employees.

The jury rendered a verdict for the defendant and the action was dismissed. Plaintiff made timely objection to certain instructions and proposed her own. Essentially the question raised is: Must the manufacturer warn the ultimate consumer (in this case the trimmers) of dangers presented by its product, or stated alternatively, was the

manufacturer's duty satisfied with warnings given to the employer, Rogers, of the hazards of the product? The court's instruction No. 16 was to the effect that, "The manufacturer is not required to communicate warnings concerning the safe use, or hazards, to its employees of its purchaser." This practically directed a verdict for the defendant.

Plaintiff relies heavily upon *Haugen v. Minnesota Mining & Mfg. Co.*, 15 Wn. App. 379, 550 P.2d 71 (1976). In that case the plaintiff was using a defective grinding disc which virtually exploded, injuring him, resulting in the loss of an eye. In that case, the product was defective. There is no showing here that the caustic soda was defective. The court stated:

> [We] hold that a manufacturer may be held strictly liable if a plaintiff establishes that a product is unreasonably dangerous, though faultlessly manufactured, when placed in the hands of a user without giving suitable and adequate warnings or instructions concerning the safe manner in which to use it. *See Rindlisbaker v. Wilson,* 95 Idaho 752, 519 P.2d 421 (1974).

*Haugen v. Minnesota Mining & Mfg. Co., supra* at 388. *Rindlisbaker v. Wilson,* 95 Idaho 752, 519 P.2d 421 (1974), involved a factual question of the defendant's failure to warn that an applicator's wing on a ·liquid fertilizer machine could fall, which it did, and injured the plaintiff. The factual question was the obviousness of the danger involved in the applicator wing lowering procedure.

Plaintiff also cites as supportive of her position *Jackson v. Coast Paint & Lacquer Co.,* 499 F.2d 809 (9th Cir. 1974). The plaintiff was injured by a fire which occurred while he was spray painting the inside of a tank using defendant's product. The question arose as to whether the paint was adequately labeled not only as to ventilation but as to inflammability. In approving the test in Restatement (Second) of Torts § 402(a) (1965) (adopted by Washington in *Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 570 P.2d 438 (1977)), the court held it is not essential to strict liability

that the product be defective in its manufacture; if it is unreasonably dangerous, that is enough. The manufacturer may be liable to consumers because of a failure to warn of its dangerous characteristics. In *Jackson v. Coast Paint & Lacquer Co., supra* at 812–13, the court stated:

> The seller's duty under § 402A is to "the ultimate user or consumer." At least in the case of paint sold in labeled containers, the adequacy of warnings must be measured according to whatever knowledge and understanding may be common to painters who will actually open the containers and use the paints; the possibly superior knowledge and understanding of painting contractors is irrelevant.

The court called attention on pages 813–14 to the fact that "Paint is not a product 'the use of which is to be directed by technicians or engineers.' Further it is a product so dispensed that warning to the ultimate consumer can readily be given." A distinction was drawn between packaged paint on one hand and other products.

■ We find the above cases distinguishable. Restatement (Second) of Torts § 388(b) (1965), provides that prior to imposition of liability upon the manufacturer, it must be established that the supplier

> has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, . . .

Comment (*k*) at page 306 of the Restatement elaborates on the meaning of section 388(b):

> *k. When warning of defects unnecessary.* One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him . . . if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved.

Here, Pennwalt gave ample warning of the defects to Rogers, and there is no suggestion that its warnings were insufficient. Pennwalt had no control over the use of its product in the Rogers plant, unless, as suggested in oral

argument, it would be made a condition of doing business with Rogers. This would assure that the warnings would be promulgated and followed. Counsel also suggested alternatively that Rogers give a hold–harmless agreement to Pennwalt. We must look at the realities of the situation. The law does not require this extreme position. We doubt any manufacturer could or would try to exert such commercial pressure on a prospective customer.

In *Little v. PPG Indus., Inc.,* 19 Wn. App. 812, 579 P.2d 940 (1978), the application of section 402(a) of the Restatement was discussed in the case where a man was found dead in a sump, the evidence indicating he had died from the inspiration of Tri–Ethane manufactured by the defendant. The barrels of defendant's brand had been lettered with a caution that the vapor may be harmful, but the plaintiff's witness testified that the labeling was inadequate and that it should have been labeled with a skull and crossbones with a yellow background containing such words as "very dangerous," "highly toxic," or "poisonous." Thus, the question of fact was whether the warnings were adequate. The court stated:

> And if the product has dangerous propensities . . . unless the dangers are obvious or known to the user, the manufacturer will be held strictly liable if it has not adequately warned the user of the dangers inherent in the use of the product by, for example, *affixing a proper label.*

(Italics ours.) *Little v. PPG Indus., Inc., supra* at 822. This implies feasibility. Nothing in this opinion excludes any cause of action by the plaintiff for her injuries, but only refuses to extend liability to a remote manufacturer.

In discussing the principle of the superseding or intervening cause, the court stated, quoting W. Prosser, *Law of Torts* § 102, at 667–68 (4th ed. 1971):

> *On the other hand, it is ordinarily not reasonably to be expected that one who knows that a chattel is dangerous will pass it on to another without a warning. Where the buyer is notified of the danger, or discovers it for himself, and delivers the product without*

*warning, it usually has been held that the responsibility is shifted to him, and that his negligence supersedes the liability of the seller.*

*Little v. PPG Indus., Inc., supra* at 824.

The doctrine is particularly appropriate when, as here, the intermediate buyer is a large industrial concern with its own safety programs and method of product distribution and where the manufacturer may have no effective means of communicating the warnings to the ultimate user. The supplier has fulfilled its duty when it gives adequate warning to the intermediate buyer or supervisory personnel and the product is not in the original can, box, or form, such as a grinding disc, and it is reasonable to expect that the intermediate buyer has a safety program and that it will communicate whatever is necessary to the ultimate users. In reaching this conclusion, we are fortified in our position by *Jacobson v. Colorado Fuel & Iron Corp.*, 409 F.2d 1263 (9th Cir. 1969). There a man was killed when a steel strand, which was being used in a concrete prestressing operation, failed. In response to the argument that the manufacturer had a duty to warn, and that it be especially communicated to the decedent, the court referred to Restatement (Second) of Torts § 388 (1965). Quoting comment (*k*), it stated:

> One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him * * * if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved.

*Jacobson v. Colorado Fuel & Iron Corp., supra* at 1270. The supplier is liable only if he has no reason to believe that those who use it will not have such special experience as will enable them to perceive the danger. Then "'[H]e is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize.'" *Jacobson v. Colorado Fuel & Iron Corp., supra* at 1270. Discussing *Hopkins v. E.I. Du Pont De Nemours &*

*Co.,* 212 F.2d 623 (3d Cir. 1954), where there was a premature explosion of dynamite, the blasting foreman had knowledge of the danger; therefore, the manufacturer of the dynamite was not liable for failing to warn the ultimate purchaser. The court pointed out that:

This is a salutary rule because obviously there is no point in giving a warning of a dangerous product to the purchaser whose supervising personnel, the ones who are going to direct the use of it, already have sufficient knowledge of the danger inherent in the product.

*Jacobson v. Colorado Fuel & Iron Corp., supra* at 1271. Since, in the *Jacobson* case, the decedent's employer and supervisory personnel did know the dangers inherent in the use of the defendant's product, any breach of duty owed the decedent was the liability of the decedent's employer and supervising personnel and not the liability of the defendant manufacturer.

The judgment of the trial court is affirmed.

GREEN, C.J., and McINTURFF, J., concur.

Reconsideration denied March 13, 1979.

Review granted by Supreme Court May 25, 1979.