**Betty ADAMS, Joseph Adams, Plaintiffs-Appellants,**

v.

**UNION CARBIDE CORPORATION, Defendant-Appellee.**

No. 83–3239.

United States Court of Appeals, Sixth Circuit.

Argued March 16, 1984.

Decided July 2, 1984.

---

Weick, Senior Circuit Judge, filed a dissenting opinion.

Milton Dunn, Russell Bensing (argued), Beachwood, Ohio, for plaintiffs-appellants.

Robert C. Maynard (argued), Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant-appellee.

Before ENGEL and KRUPANSKY, Circuit Judges, and WEICK, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Plaintiff Betty Adams, a former employee of General Motors Corporation (GMC), brought this diversity action against Union Carbide Corporation in the United States District Court for the Northern District of Ohio. Plaintiff alleged that Union Carbide failed to adequately warn GMC employees of the dangerous propensities of the chemical toluene diisocyanate (TDI), which Union Carbide manufactured and supplied to GMC for use in GMC's automobile assembling process. Plaintiff further contended that as a result of defendant's negligence, she developed a respiratory ailment known as "TDI asthma". Plaintiff sought $500,000 in damages. Plaintiff's husband, Joseph Adams, also sought $50,000 in compensation for the loss of his wife's services, companionship and consortium.

On March 10, 1983, the district court granted defendant's motion for summary judgment. Plaintiff's appeal to this court was predicated on the theory that material issues of fact were presented by this negligence action which should have been submitted to a jury rather than summarily resolved by the court below.

The record disclosed that plaintiff Adams was employed by the Fisher Body Division of GMC at its Elyria, Ohio plant between 1967 and 1978. TDI was first supplied to GMC for use in making automobile seat cushions in 1969. The chemical was delivered in bulk liquid shipments either by tank trucks or rail tank cars and transferred from the common carrier into GMC storage tanks. The TDI was then pumped, as needed, into a closed vessel system for automatic mixing with other chemicals. The only potential exposure GMC employees had to TDI vapors occurred when the seat cushions were removed from their open molds.

Union Carbide admitted that its officials were aware of respiratory hazards associated with exposure to TDI vapors as early as 1964. In 1969, defendant prepared a manual specifically addressing these conditions for GMC. Attached to this report were eight related articles on TDI's use in manufacturing which had been prepared by various sources. Of special relevance to the case at bar was an article entitled "Chemical Safety Data Sheet SD–73" prepared by the Manufacturing Chemists Association. The article detailed the "properties and essential information for safe handling and use of TDI." Included in this publication was a section entitled "Employee Safety," which read in pertinent part:

5.1.1. Employee training is probably the most important safety measure a company can take.... An effective employee education should include the following items:

\* \* \* \* \* \*

(e) He should know when personal protective equipment is to be used and how to use it effectively.

5.1.2. It is the responsibility of supervision to train each worker, and, equally as important, to instill within him an attitude of safety. The supervisor must procure the necessary safety equipment and be sure that it is maintained in working order at all times.

5.1.3. Operating procedures, including all safety rules, should be posted in work areas where they may be read by employees.

In 1975, officials from GMC and Union Carbide met to discuss the handling of TDI to minimize personnel exposure. Additional guidelines were furnished to GMC following this conference.

Plaintiff Adams worked in various departments in the Elyria plant during the course of her employment, including Department No. 5, where automobile seat cushions were removed from their molds and exposure to TDI was possible. Plaintiff's medical records indicated that she had sought medical attention as early as 1969 for symptoms related to exposure to fumes and gaseous materials. In 1974, plaintiff's doctor advised GMC that Adams not be assigned to any area where the air was contaminated with fumes because of her bronchopulmonary condition. GMC's plant physician discussed this letter with the plaintiff and suggested she continue working in Department No. 5 on a trial basis. One year later, in February, 1975, plaintiff's treating physician again wrote to GMC and recommended that plaintiff be permanently reassigned from Department No. 5 due to her chronic bronchitis.

Plaintiff was permanently restricted from Department No. 5 thereafter. Her employment records disclosed that she was placed on temporary disability several times by her treating physician due to bronchitis and flue. In September, 1978 plaintiff came under the care of a different treating physician, who certified that plaintiff was permanently disabled from work due to TDI hypersensitivity from work-related exposure.

Plaintiff filed her complaint on June 20, 1980, alleging that Union Carbide was negligent in failing to warn GMC and its employees of the "harmful, toxic and deleterious effects to TDI" and that as a result of defendant's negligence, "she has been rendered totally disabled." On May 11, 1982 defendant Union Carbide filed a motion for summary judgment which it supported with two claims: (1) that the warnings given by Union Carbide to plaintiff's employer GMC satisfied its duty of reasonable care to the plaintiff, and (2) that the statute of limitations barred plaintiff's action. The district court granted defendant's motion for summary judgment based upon its finding that the case presented no unresolved material issue of fact, and that as a matter of Ohio law, defendant did not breach its duty to plaintiff. The lower court did not address the statute of limitations issue.

The grant or denial of summary judgment must be made in accordance with Fed.R.Civ.P. 56, which states in pertinent part:

(c) Motions and Proceedings Thereon.... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

██ The standard to be applied in determining motions for summary judgment was enunciated by this Circuit over 20 years ago and is still in accord with the overwhelming weight of authority:

In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scruti-

nized, whereas the opponent's are indulgently treated.

*Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir. 1962). *See also United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Sankovich v. Life Insurance Company of North America,* 638 F.2d 136 (9th Cir.1981).

After recognizing the above criteria for summary judgment as controlling, the trial judge in the instant case wrote:

A thorough examination of all evidence presented here compels the conclusion that no material issue of fact exists in this conflict. The parties neither dispute that defendant warned GM, Mrs. Adams' employer, of the dangers related to TDI but did not warn Mrs. Adams directly, nor do they dispute the notations in GM's medical records referring to ailments suffered by Mrs. Adams during the course of employment. There remains only the application of these undisputed facts to the appropriate legal standards.

The lower court then proceeded to apply the facts as established to the "appropriate legal standard", which under Ohio law is found in the Restatement (Second) of Torts § 388.[1] Section 388 reads:

## § 388. Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Comment n following the restatement advises that the manufacturer's duty to warn may be discharged by providing information of the dangerous propensities of the product to a third person (GMC in the instant case) upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who will be exposed to its hazardous effects. The comment adds that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so."

Although most negligence actions are resolved by submission to a jury, "it would be a mistake to conclude summary judgment is never appropriate in a negligence action." *Croley v. Matson Navigation Company,* 434 F.2d 73 (5th Cir.1970). *Croley* and other decisions provide ample authority for the use of summary judgment in cases where the alleged negligence of a manufacturer is at issue. *See, e.g., Gracyalny v. Westinghouse Electric Corporation,* 723 F.2d 1311, 1316 (7th Cir.1983) ("a grant of summary judgment may be affirmed on any ground that finds support in the record"); *Bryant v. Technical Research Company,* 654 F.2d 1337 (9th Cir. 1981); *Aetna v. Loveland Gas & Electric,* 369 F.2d 648 (6th Cir.1966); *Millhouse v. General Tire and Rubber,* 9 Ohio App.3rd 203, 459 N.E.2d 623 (1983).

The evidence which was before the court below demonstrated that TDI was delivered by Union Carbide to GMC in bulk liquid form. After the delivery, GMC had

---

1. A court sitting in diversity is bound to apply the law of the state's highest court. *Coleman v. Western Electric Co.,* 671 F.2d 980, 983 (6th Cir.1982). The district court determined that the Ohio Supreme Court has not ruled specifically on the duty of a manufacturer of dangerous products to warn third parties, such as the plaintiff in this action, of its dangerous propen-

sities. However, the lower court concluded that if the Ohio Supreme Court had spoken on the issue, it would probably follow the reasoning of *Sams v. Englewood Ready-Mix Corp.,* 22 Ohio App.2d 168, 259 N.E.2d 507 (1969), which accepted § 388 of the restatement of torts. Neither party challenges this conclusion.

exclusive control over both the chemical and the GMC employees who came into contact with it.

■ While § 388 defines a manufacturer's duty to warn those who may ultimately be exposed to its product, comment n to the restatement also explains that the duty can be discharged by the manufacturer's reasoanble reliance on a third party—in this case GMC—to convey the information supplied by the manufacturer to the ultimate user—in this case employees such as Betty Adams. The fact that GMC repeatedly updated its information about TDI from Union Carbide, coupled with the fact that GMC itself had a duty to its employees to provide them with a safe place to work, supports the inescapable conclusion that it was reasonable for Union Carbide to rely upon GMC to convey the information about the hazardous propensities of TDI to its employees within the context of comment n of the restatement.

The dissent's rejection of the above conclusion is based upon a bootstrap-type analysis. First the dissent concludes that *GMC* did not adequately warn its employees of the dangerous propensities of TDI. (Post at 1462). The dissent thereupon erroneously relies upon *GMC*'s failure to adequately advise its employees of the hazardous propensities of TDI as proof of Union Carbide's negligence. However, the key issue in this case is not, as the dissent seems to hypothesize, whether the information supplied by Union Carbide actually reached GMC's employees. Rather, the critical question is whether Union Carbide's reliance upon GMC to relay the information to its employees was reasonable, when viewed in light of GMC's duty to safeguard its employees' health and in consideration of the fact that comprehensive information concerning the use of TDI was conveyed by Union Carbide to GMC for the express purpose of dissemination to GMC's employees.

In effect, the dissent is interpreting GMC's failure to relay the information to its employees as negligence attributable to Union Carbide. The negligence of GMC under the circumstances disclosed by the record in this case cannot vicariously be imposed upon Union Carbide.

Based upon the foregoing factual analysis of the case, there remained no "genuine issue as to any material fact" which required jury consideration, and therefore the grant of summary judgment was proper. This court's reasoning and ultimate conclusion is reflected in *Millhouse v. General Tire and Rubber Co.,* 9 Ohio App.3rd 203, 459 N.E.2d 623 (1983), wherein a company called Mobile Wash had contracted to clean defendant's tank cars, certain of which had contained the chemical TDI. An employee of Mobile Wash was overcome with fumes and died while cleaning a TDI tanker. The Administratrix of the decedent's estate commenced an action against General Tire, alleging, *inter alia,* that it was negligent in failing to warn Mobile Wash Employees of the dangerous propensities of TDI. The trial court granted summary judgment for the defendant and the state appellate court affirmed. The court held that there were no material issues of fact in the case because uncontroverted evidence disclosed that defendant had notified Mobile Wash that the tank cars had contained TDI, and that Mobile Wash supervisors had been warned of the hazards inherent to TDI. While the *Millhouse* decision was predicated on the defendant's duty to warn employees of an independent contractor, it's resolution is directly analogous to a situation, like the case at bar, where a manufacturer's duty to warn employees of a company which uses its product is at issue.

In a case strikingly similar to the case at bar, *Younger v. Dow Corning Corp.,* 202 Kan. 674, 451 P.2d 177 (1969), the Kansas Supreme Court upheld the grant of summary judgment in favor of the defendant manufacturer on the basis that adequate warnings had been given to the immediate vendee, thereby satisfying the manufacturer's duty to warn the vendee's employees of dangers related to exposure to TDI. As in the case at bar, the defendant had sold TDI to the plaintiff's employer and had warned the employer of the chemical's dangerous propensities.

Similarly, in *Reed v. Pennwalt Corp.,* 22 Wash.App. 718, 591 P.2d 478, appeal dis-

missed 93 Wash.2d 5, 604 P.2d 614 (1979), a jury verdict for defendant was upheld on appeal.[2] There the defendant supplied a food processing plant with caustic soda. This chemical was shipped in tank cars and unloaded into holding tanks owned by the food processor. It was later diluted according to a formula controlled by the processor. There was no evidence that the defendant had any control over the use of the chemical in the plant. The Washington Court of Appeals determined that the supplier's duty to warn had been fulfilled by providing adequate warning to the immediate vendee. As in the case at bar, the *Reed* court also noted that since the product was used in a different form than its original state, it was reasonable to expect that the vendee had a safety program designed to communicate adequate information about the substance to its employees.

And again, in *Jones v. Hittle Service, Inc.*, 219 Kan. 627, 549 P.2d 1383, 1393 (1976), the Kansas Supreme Court upheld summary judgment in favor of defendant, a manufacturer of propane gas, based upon the lower court's finding that the manufacturer fulfilled its duty to the ultimate consumers when it verified that the distributor to whom it sold the product in bulk was adequately trained and informed of the hazardous characteristics of the gas, and would convey that knowledge to consumers. *See also Marker v. Universal Oil Products*, 250 F.2d 603 (10th Cir.1957) (developer of a petroleum refining process had right to rely upon duty of employer who used the process to protect its own employees).

In sum, the lower court's findings of fact and application of the law is well reasoned and in line with respected precedent. The decision of the district court is hereby AFFIRMED.

**2.** Although the jury verdict on *Reed* distinguishes it from the case at bar, the point of law which *Reed* makes regarding the discharge of the manufacturer's duty to warn is directly applicable to the instant case.

**1.** An affidavit submitted by Union Carbide indicates that before Union Carbide delivered any TDI to GMC's Fisher Body-Elyria plant, it fully

WEICK, Senior Circuit Judge, dissenting:

I respectfully dissent. The district court erred in granting summary judgment in favor of defendant-appellee Union Carbide Corporation and dismissing the complaint of plaintiff-appellant Betty Adams, thereby depriving her of her right to trial by jury to which she was justly entitled.

In her complaint, Mrs. Adams had alleged that defendant Union Carbide Corporation was negligent in failing and neglecting to warn her of the harmful, toxic and deleterious effects of her exposure to the poisonous fumes of toluene diisocyanate (TDI) which it manufactured and supplied to her employer, General Motors Corporation (GMC), and which had permeated the entire area of the plant where she was employed and working. As a direct and proximate result thereof, she contracted TDI hypersensitivity asthma and became totally and permanently disabled.

In my opinion, construing the evidence in its most favorable light in favor of Mrs. Adams, to which she was justly entitled under the law, there were genuine issues of material fact not properly disposed of by summary judgment. The judgment of the district court should therefore be reversed.

## I

### The Facts

The uncontroverted facts underlying this dispute bear repeating and clarification. Although Mrs. Adams was not certified as permanently disabled due to "TDI hypersensitivity asthma from exposure at work" until October 1, 1978, GMC was first advised as early as May, 1969, by her private doctor that she was experiencing significant eye and throat irritation and a cough because of "vapors at her work."[1] On

informed plaintiff's employer of all potentially harmful, toxic and deleterious effects of TDI at a meeting on or about February 4, 1969. Mrs. Adams began her employment in Department No. 5 in 1967, but the onset of her symptoms in May, 1969 from "fumes" and "vapors" is consistent with the delivery of TDI by defendant after the February 4 meeting. The relatively short period of time elapsing before the onset of her

November 10, 1971, Mrs. Adams complained to GMC's plant physician "that fumes from a tank near where she was working were causing a 'burning throat,'" and she was temporarily relieved from working in Department No. 5. Twenty days later, however, after noting that her symptoms had cleared, GMC's physician requested her to return to Department No. 5. In February, 1974, Mrs. Adams' physician treated her for bronchopulmonary problems, and advised GMC that she should not be assigned to work where the air was contaminated with these irritating fumes. Notwithstanding this recommendation, the GMC physician encouraged Mrs. Adams to remain in Department No. 5 on a "trial" basis. One year later, in February, 1975, her personal physician recommended that she be removed permanently from Department No. 5 because of chronic bronchitis, and the GMC plant physician concurred. Following, Mrs. Adams' permanent restriction from Department No. 5, she was placed on temporary disability by her personal physician for bronchitis and flue several times in 1978, prior to being certified by a different physician as permanently disabled due to "TDI hypersensitivity asthma."

The extent of plaintiff's exposure to TDI vapors is disputed. Although the majority indicates "[t]he only potential exposure GMC employees had to TDI vapors occurred when the seat cushions were removed from their open molds," Mrs. Adams stated in her deposition that due to inadequate ventilation, she was exposed to the fumes from Department No. 5 even when she was working in another department. Additionally, she stated that on at least one occasion, she was directly exposed to TDI during a chemical spill, although she did not learn of the chemical's identity until her union told her it was TDI. Furthermore, Mrs. Adams testified that GMC never told her that she was working with TDI, never provided her with written safety procedures applicable in the event of chemical spills, and never screened her health background prior to sending her into difficulties highlights the extremely dangerous

Department No. 5. Defendant Union Carbide presented no contrary evidence.

## II

## General Principles of Negligence Law

Since none of the parties contest the applicability of Restatement (Second) of Torts § 388 (1965) as the legal standard defining defendant's duty to plaintiff, I turn to those principles of negligence law which are embodied in § 388 to determine whether, as a matter of law, Union Carbide, the manufacturer of TDI, exercised reasonable care to inform the employees of GMC, including Mrs. Adams, of TDI's dangerous condition or of the facts which make TDI likely to be dangerous. Stated otherwise, in the context of this case, we must determine whether reasonable men could differ as to whether it was reasonable for defendant Union Carbide to totally rely on GMC to communicate the information about TDI to the ultimate users of the product, including plaintiff, who would be exposed to the product's hazardous effects.

Comment n to § 388 is concerned with warnings given to third persons, such as GMC. It states in pertinent part:

> *Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability.* It is merely a means by which this information is to be conveyed to those who are to use the chattel. *The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.* All sorts of chattels may be supplied for the use of others, through all sorts of third persons and under an infinite variety of circumstances. This being true, it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use

nature of Union Carbide's product.

the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe. There are, however, certain factors which are important in determining this question. There is necessarily some chance that information given to the third person will not be communicated by him to those who are to use the chattel. This chance varies with the circumstances existing at the time the chattel is turned over to the third person, or permission is given to him to allow others to use it. These circumstances include the known or knowable character of the third person and may also include the purpose for which the chattel is given. Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so. *If the chattel is one which if ignorantly used contains no great chance of causing anything more than some comparatively trivial harm, it is reasonable to permit the one who supplies the chattel through a third person to rely upon the fact that the third person is an ordinary normal man to whose discredit the supplier knows nothing, as a sufficient assurance that information given to him will be passed on to those who are to use the chattel.*

If, however, the third person is known to be careless or inconsiderate or if the purpose for which the chattel is to be used is to his advantage and knowledge of the true character of the chattel is likely to prevent its being used and so to deprive him of this advantage—as when goods so defective as to be unsalable are sold by a wholesaler to a retailer—the supplier of the chattel has reason to expect, or at least suspect, that the information will fail to reach those who are to use the chattel and whose safety depends upon their knowledge of its true character. In such a case, the supplier may well be required to go further than to tell such a third person of the dangerous character of the article, or, if he fails to

do so, to take the risk of being subjected to liability if the information is not brought home to those whom the supplier should expect to use the chattel. In many cases the burden of doing so is slight, as when the chattel is to be used in the presence or vicinity of the person supplying it, so that he could easily give a personal warning to those who are to use the chattel. Even though the supplier has no practicable opportunity to give this information directly and in person to those who are to use the chattel or share in its use, it is not unreasonable to require him to make good any harm which is caused by his using so unreliable a method of giving the information which is obviously necessary to make the chattel safe for those who use it and those in the vicinity of its use.

Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, *the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them (see § 291), and the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result (see § 293).* Since the care which must be taken always increases with the danger involved, it may be reasonable to require those who supply through others chattels which if ignorantly used involve grave risk of serious harm to those who use them and those in the vicinity of their use, to take precautions to bring the information home to the users of such chattels which it would be unreasonable to demand were the chattels of a less dangerous character.

Thus, while it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it unless he knows that the other is careless, *it may be improper to permit him to trust the conveyance of the*

*necessary information of the actual character of a highly dangerous article to a third person of whose character he knows nothing.* It may well be that he should take the risk that this information may not be communicated, *unless he exercises reasonable care to ascertain the character of the third person,* or unless from previous experience with him or from the excellence of his reputation the supplier has positive reason to believe that he is careful. *In addition to this, if the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful.* Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character. Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them. (Emphasis added).

The majority's quote from Comment n that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so," *supra* at 1456, barely scratches the surface of considerations which must be weighed and balanced in determining whether Union Carbide discharged its duty to exercise reasonable care to inform Mrs. Adams of the dangerous nature of TDI. Whether it is reasonable to rely on the third party to inform the ultimate user about the product's hazardous properties requires a balancing of such factors as the dangerous nature of the product, the burdens imposed by requiring warnings to the ultimate users, the likelihood that the particular warning will be adequately communicated to those who will foreseeably use

the product, the intensity and form of the warnings given, and the form in which the product is used. *See Dougherty v. Hooker Chemical Corp.,* 540 F.2d 174, 179 (3d Cir. 1976).

The majority opinion holds:

The fact that GMC repeatedly updated its information about TDI from Union Carbide, coupled with the fact that GMC had a duty to its employees to provide them with a safe place to work, supports the inescapable conclusion that it was reasonable for Union Carbide to rely on GMC to convey the information about the hazardous propensities of TDI to its employees within the context of comment n of the restatement.

*Supra* at 1457. Not only do I disagree both with the inescapability of such conclusion and with its underlying premises, but I conclude, to the contrary, that there is no evidence to support the reasonableness of Union Carbide's actions, and therefore, that there are genuine issues of material fact not appropriate for resolution by summary judgment.

There is no evidence that "GMC repeatedly updated its information about TDI from Union Carbide." Based on an extensive review of the entire record before the District Court, it is clear that GMC, at best, discussed the dangers of TDI with defendant only twice—once in 1969 prior to delivery of TDI by defendant, and again in 1975, some six and one-half years after GMC first began TDI use. What the majority has characterized as "repeatedly" really constitutes only isolated communications between GMC and Union Carbide. In plaintiff's case, the communications were infrequent enough for her to become substantially disabled through repeated exposure to a poisonous product as extremely dangerous as TDI.

The assertion that Union Carbide could rely on GMC because "GMC itself had a duty to its employees to provide them with a safe place to work" is questionable. Accepting the fact that such duty exists, I find not an iota of evidence in the record before the district court or this Court that

Union Carbide relied on GMC's discharge of this duty as the reason for failing to notify Mrs. Adams and the other ultimate users about the dangers of TDI. Furthermore, even if defendant did so rely, there is no evidence of any actions taken by Union Carbide either before or after the February 4, 1969 meeting to determine how successfully GMC was discharging its duty to provide a safe work place, such that Union Carbide's reliance on GMC to disseminate warnings about TDI could be termed "reasonable." What the record does support are findings that GMC never communicated the dangers of TDI to Mrs. Adams, never informed her of emergency procedures in the event of a TDI spill, and never screened her for TDI sensitivity while she was employed in Department No. 5, even after her illnesses due to exposure to poisonous "fumes" in that department. In light of these facts, a conclusion that defendant's reliance on GMC was reasonable as a matter of law is insupportable.[2]

Comment n addresses the majority's implicit assumption that GMC will behave as "an ordinary normal man" in the discharge of its duty to its employees to provide a safe place to work as follows:

> If the chattel is one *which if ignorantly used contains no great chance of causing anything more than some comparatively trivial harm,* it is reasonable to permit the one who supplies the chattel through a third person to rely upon the fact that the third person is an ordinary normal man to whose discredit the supplier knows nothing, as a sufficient assurance that information given to him

will be passed on to those who are to use the chattel. (Emphasis added).

There is no dispute that TDI is an extremely dangerous, poisonous product. Defendant Union Carbide admitted that its officials were aware of respiratory hazards associated with exposure to TDI vapors as early as 1964. The magnitude of substantial harm resulting from improper use of the product is further evidenced by Mrs. Adams' statement in her deposition that "38 employees [at the Elyria plant] have been damaged by TDI." (Appendix 138). Perhaps this widespread injury was the reason GMC saw fit in 1975 to recontact Union Carbide with the express purpose of discussing safeguards for its employees working with TDI.

The risk to Mrs. Adams and other users of TDI could never be considered "some comparatively trivial harm." Thus, it is error for this Court to conclude under Comment n that defendant could rely, as a matter of law, on GMC's duty to its employees to provide them with a safe place to work, particularly since defendant could easily have ascertained that GMC gave no warnings of any kind to its employees, including Mrs. Adams, and did not provide them with a safe place to work, and additionally that poisonous fumes were permeating through the entire work area and a number of its employees including Mrs. Adams were being affected.

### III

#### The Controlling Case Law

The district court noted:

> the occurrence of meetings between its experts and GM medical staff and industrial hygienists [sic]. (Emphasis added).

For purposes of summary judgment, GMC's failure to warn should be construed against defendant as the moving party, at least to the extent such negative inference speaks to the unreasonableness of defendant's total reliance on GMC. Furthermore, the district court's conclusions regarding the quality of GMC's efforts to seek "continuing information" and to implement a "safety program" are directly refuted by the record, and should be found by this Court to be clearly erroneous.

---

**2.** Similarly, the district court's opinion stated: No inference can be drawn that defendant breached its duty by relying on GM to inform its own employees of these warnings under its safety programs. In fact, there is evidence that GM sought and was given *continuing information* in regard to employee safety which would foster reasonable reliance by defendant. (Emphasis added).

and

> There is no evidence suggesting that GM did not have a safety program to inform employees of its warnings upon which defendant could reasonably rely. To the contrary, the affidavits submitted by defendant substantiate

When the highest court has not ruled on an area of law, the federal court must ascertain the state law from all available sources. When a state appellate court announces and relies on a principle, a federal court should recognize that reliance as indicative of state law unless it is convinced that the highest court would decide differently. *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 61 St. [sic] Ct. 179, 85 L.Ed. 139 (1940); *Ruth v. Bitumerous* [sic] *Casualty Corp.*, 427 F.2d 290 (6th Cir.1970).

I cannot agree with the majority's conclusion that Ohio would hold, as a matter of law, that defendant Union Carbide exercised reasonable care and was discharged from liability thereby, because it provided warnings to GMC, particularly when the warnings were not adequately communicated to the ultimate users.

In my opinion, the clearest statement of Ohio law applicable to this case is found in *Hargis v. Doe,* 3 Ohio App.3d 36, 443 N.E.2d 1008 (1981). In *Hargis,* the plaintiff was injured when his clothing caught fire after becoming dampened with a degreasing solvent supplied by the defendant. At the time of the accident, Hargis was not using the solvent for its intended cleaning purpose, but instead to detect faulty welds in automatic torque converters by immersion in a vat of the solvent.

In *Hargis,* the Ohio Court of Appeals held that a supplier is subject to liability for damages proximately caused by any reasonable use of the product for any purpose, "if he fails to exercise reasonable care to give the user information which [the supplier] has and which [the supplier] should realize would be necessary to make use of the product safe. See Restatement of Torts 2d, Section 388." 3 Ohio App.3d at 37, 443 N.E.2d 1008. In fact, the court in *Hargis* specifically held that the supplier did have a duty to warn the user, Hargis, of the flammable nature of the product and to proscribe its use around fire. *Id.* Because Ohio recognizes the existence of this duty to warn, the failure of the supplier to warn the user is sufficient to overcome a verdict for defendant supplier as a matter of law on the specific issue of negligence.

*Id.* This Court is incorrect in holding otherwise on the issue of negligence.

According to *Hargis,* however, a finding of negligence is not dispositive of plaintiff's right to recover damages. The appropriate standard of law defined by the Ohio Court of Appeals is set out in Headnote 2:

> Where a particular product *is not inherently dangerous,* and *where the supplier has no access to an employee,* some causal relationship between the failure to warn and the injuries must be shown in order to overcome a motion for directed verdict. (Emphasis added).

*Id.* at 36, 443 N.E.2d 1008. In so holding, the Ohio Court of Appeals has also spoken to plaintiff Adams' action by stating that

> [a]lthough the inherent dangers of certain types of products, such as poisons, explosives, drugs, and the like, *may require personal notice to the user without reference to any intervening source,* in other situations [involving products not unreasonably dangerous in their foreseeable uses], the requirement of an adequate warning extends only to those to whom the distributor has reasonable access. (Emphasis added).

*Id.* at 38, 443 N.E.2d 1008. Thus, under *Hargis,* defendant Union Carbide, the producer and supplier of a concededly extremely dangerous and poisonous product, owed plaintiff a duty to warn of TDI's dangers, regardless of any warnings supplied to GMC, and plaintiff may even be entitled to judgment, as a matter of Ohio law, for her damages suffered as a result of defendant's failure to notify her personally of the dangerous properties of its product.

The majority's reliance on *Millhouse, supra* at 1457, is misplaced. First of all, the decision in *Millhouse* was based on the law of agency, and not products liability. The deceased was not a user of the product, but instead the employee of an independent contractor hired by defendant General Tire to clean one of defendant's tank cars containing TDI. In Ohio, there is a rule of general acceptance that where an independent contractor undertakes potentially dan-

gerous work for another and one of the independent contractor's employees is injured, no liability ordinarily attaches to the party who engaged the independent contractor. *Millhouse,* 9 Ohio App.3d at 204, 459 N.E.2d 623. By contrast, *Hargis, supra,* makes it clear that there is no analogous rule for products liability cases involving § 388.

*Millhouse* is also distinguishable on its facts: it was uncontested in the case that the employer had established safety procedures for working around TDI, and that the deceased plaintiff in fact had been warned of the properties of TDI. *Id.* Furthermore, the tank car which the deceased was cleaning had the letters "TDI" stenciled on, and had a poison placard on each side and end. *Id.* at 203, 459 N.E.2d 623. None of these or similar facts have been established in Mrs. Adams' case.[3]

The decisions of the courts of Kansas and Washington are also distinguishable. In *Younger,* the Kansas Supreme Court specifically noted that the case *did not* involve a highly dangerous explosive or poisonous product. 451 P.2d at 184. In *Jones,* the ultimate users were unknown, there was no adequate means to express any warnings to the users, and the supplier had verified that the third party was capable of conveying the necessary information to the consumers. 549 P.2d at 1384, 1394. The decision in *Reed* was based on the doctrine of intervening negligence of the third party employer as the superceding cause of the damage, 591 P.2d at 481–82; this doctrine was limited in the case of extremely dangerous products by *Hargis, supra,* and furthermore requires a finding

of duty to notify the ultimate user, which this Court incorrectly has found not to exist in this case, contrary to *Hargis.*[4]

Additionally, the majority has disregarded respected precedent of the highest courts of North Dakota and Arizona, both of which have adopted a much more expansive view of Comment n than the courts of Kansas and Washington. *See Seibel v. Symons Corp.,* 221 N.W.2d 50, 57 (N.D. 1974); *Shell Oil Co. v. Gutierrez,* 119 Ariz. 426, 581 P.2d 271, 278–79 (1978). The decision of the Ohio Court of Appeals in *Hargis* is consistent with these cases, and we have no reason to believe the Ohio Supreme Court would hold otherwise. *See also* Hasten, *Comparative Liability Principles: Should They Now Apply to Strict Products Liability Actions in Ohio,* 14 U.Tol.L. Rev. 1151, 1181 n. 88 (1983). Thus, we are bound to apply that law to the present suit founded upon diversity. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

## IV

### The District Court Improperly Granted Summary Judgment

Determining whether the supplier's duty has been reasonably discharged under Section 388 comes within the function of the trier of fact. *See Dougherty, supra,* 540 F.2d at 179. Thus, the issue in this case was not proper for resolution by summary judgment. *Accord Bryant v. Technical Research Co.,* 654 F.2d 1337, 1345–46 (9th Cir.1981); *Hopkins v. Chip-In-Saw, Inc.,* 630 F.2d 616, 620 n. 5 (8th Cir.1980); *Weekes v. Michigan Chrome & Chemical*

---

**3.** If *Millhouse* may be relied on at all, it is for the proposition that TDI is extremely dangerous and even fatal if not used under proper conditions. The procedures established by Millhouse's employer required the employee to wear a full wet suit, including a jacket, pants, rubber gloves and boots, a mask, a breathing motor which supplies air through a hose, wristlets and a safety line. 9 Ohio App.3d at 204, 459 N.E.2d 623. Millhouse's failure to wear a mask and independent breathing source resulted in his unfortunate demise.

In this case, as was already noted, Mrs. Adams stated that GMC had no safety procedures

regarding TDI, and even failed to provide adequate ventilation in the workplace. Perhaps if plaintiff and other GMC employees had been informed of the TDI use, they could have ensured the adoption of proper procedures by GMC.

**4.** *Marker v. Universal Oil Products* is also distinguishable since it involved the duty to warn when there was a gross misuse of the product supplied to the third party. 250 F.2d at 606–07. In this case, by contrast, the TDI was used as envisioned by defendant and GMC, so that unanticipated misuse did not create the danger.

*Co.,* 352 F.2d 603, 607 (6th Cir.1965) (supplier must reasonably assure itself that third party likely to transmit information to ultimate users); *Hargis, supra,* (existence of duty sufficient to prevent directed verdict on issue of negligence alone); *Sams v. Englewood Ready-Mix Corp.,* 22 Ohio App.2d 168, 259 N.E.2d 507 (1969) (liability under Section 388 should be submitted to the trier of fact). *See also Gordon v. Niagara Machine & Tool Works,* 574 F.2d 1182, 1189 (5th Cir.1978) (supplier must have reasonable basis for believing third party could be expected to communicate warnings to users) (subsequent information gained by third party not relevant to negligence of supplier at time of original sale).

In its motion for summary judgment, defendant Union Carbide submitted that it was entitled to judgment as a matter of law based upon the following relevant, undisputed facts established by the record:

(1) Carbide fully warned GM on or about February 4, 1969 concerning the harmful, toxic and deleterious effects of TDI, including the risk of TDI asthma;

(2) Carbide provided the above warnings to GM before it supplied Fisher Body-Elyria with production quantities of TDI;

(3) Betty Adams was exposed to TDI vapor in Department 5 at Fisher Body-Elyria;

(4) As a result of said exposure, Betty Adams developed a hypersensitivity reaction to TDI and a disease known as TDI asthma.

Although Union Carbide argues that it exercised reasonable care in this case, it is apparent, based on my review of the record, a jury could reasonably find that:

(1) no warnings were communicated by Union Carbide or by GMC to GMC's employees, including plaintiff;

(2) because of the extremely dangerous propensities of TDI, Union Carbide was obliged to take reasonable steps beyond what appears in the record to warn GMC's employees (see § 388, Comment n, *supra*), including:

(a) following up on its initial discussions with GMC in February, 1969,

(b) verifying that GMC was implementing a safety program for TDI use by its employees,

(c) inspecting the conditions in GMC's plant,

(d) overseeing the actual implementation of the safety program by GMC, or

(e) actually undertaking to warn GMC's employees directly; and

(3) there was no reasonable basis for Union Carbide to rely on GMC to communicate necessary information to employees including plaintiff.

*See Gracyalny,* 723 F.2d at 1321–22; *Dougherty,* 540 F.2d at 181–82.[5]

The majority has cited evidence that TDI was delivered by Union Carbide to GMC in bulk form, and that after delivery, GMC had exclusive control over both the chemical and the GMC employees who came into contact with it, *supra* at 1457. Comment n notes that the form in which the product is used is only one factor considered in determining whether defendant exercised reasonable care. Although GMC's exclusive

---

**5.** None of the opinions cited by the majority provide adequate authority for the grant of summary judgment in this case. In *Croley, Bryant, and Gracyalny, supra,* the Circuit Courts reversed the grant of summary judgment for reasons very similar to those I have suggested here. In *Aetna Insurance,* 369 F.2d at 653, it is stated clearly for a unanimous court that it is not preferable to dispose of negligence cases by summary judgment unless, for example, the trial court would have been required to direct a verdict for the defendant if the case had gone to trial by jury. In *Hargis, supra,* the Ohio Court of Appeals made it clear that the issue of the supplier's negligence is sufficient to prevent a directed verdict for the defendant, although the issue of proximate cause may require summary judgment when the particular product is not inherently dangerous and the supplier does not have reasonable access to the ultimate user. Finally, in *Millhouse,* the Ohio Court of Appeals affirmed the grant of summary judgment because the evidence adduced by defendants established the facts necessary to find for defendants as a matter of law, and because defendants' evidence was uncontested and uncontradicted by the plaintiff. In this case, Mrs. Adams has submitted substantial evidence by way of deposition and otherwise to contradict Union Carbide's assertion that it behaved reasonably.

control over both the TDI and its employees may speak to the burdens that would have been imposed by requiring actual warnings to Mrs. Adams from Union Carbide, there is no substantive evidence in the record regarding the actual magnitude of that burden. On appeal, Union Carbide argues that the bulk form in which TDI is supplied to GMC virtually precludes a warning by Union Carbide to employees who subsequently may come in contact with TDI, and that the record demonstrates defendant had no effective means of communicating a warning except through GMC. Plaintiff argues that the burden of notification is not onerous, and could even have been accomplished by providing medical information on TDI to Mrs. Adams' union. Whomever is right, and I find no evidence in the record to support the arguments of either party, I am led inescapably to the conclusion that the issue of burden on defendant is one more genuine issue of material fact not properly resolved on summary judgment, as is, additionally, the impact of that burden on Union Carbide's right to reasonably rely on GMC.

Finally, Mrs. Adams argues that the warnings given by defendant to GMC were informationally inadequate to sufficiently apprise GMC of the dangers of TDI, and that this allegation is supported by GMC's subsequent communication with Union Carbide in 1975 for further discussions on the safeguards required with TDI usage. I reiterate that form and intensity of the warnings given is another factor which must be argued and balanced in determining whether defendant exercised reasonable care under the circumstances in this case. *Dougherty, supra.*

This is an important case involving interstate commerce, and a conflict among the circuits is occasioned by this Court's decision. I would reverse the district court's grant of summary judgment and remand the case for further proceedings, including the submission of questions of fact to the jury.