MARY VENUS *et al.*, Plaintiffs, *v.* ROBERT O'HARA, d/b/a A-1 Services, Defendant and Third-Party Plaintiff-Appellant, (Wil-Kil Pest Control Company, Inc., *et al.*, Third-Party Defendants; Kenova Chemical Company *et al.*, Third-Party Defendants-Appellees).

First District (5th Division)   No. 83—3081

Opinion filed August 10, 1984.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago, for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for appellee Kenova Chemical Co.

Matthew J. Egan, of Chicago, for appellee Benlo Chemicals, Inc.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from a summary judgment for third-party defendants Kenova Chemical Company (Kenova) and Benlo Chemicals, Inc. (Benlo), in an indemnity action predicated on a theory of strict liability for failure to adequately warn of the dangerous propensities of naphthalene flakes. Third-party plaintiff Robert O'Hara (O'Hara) contends that the trial court erred in ruling that Kenova and Benlo, bulk distributors of naphthalene flakes, could not be held directly liable to him for the failure to provide adequate warnings.

Plaintiffs Mary, Dennis, and Sally Venus (Venus) filed a multicount complaint against O'Hara, alleging in pertinent part that his services were engaged on May 6, 1977, to rid the Venus residence of an animal

which had gained access to the attic thereof, and that he was negligent in spreading toxic chemicals in the attic as a method of extermination, in failing to prevent the spread of chemical contamination throughout the residence, and in failing to warn them of the inherently dangerous nature of the chemical used. Venus also asserted that, as a proximate result of this negligence, the residence was rendered unfit for human habitation, their household furnishings were made unfit for use, and each of them suffered personal injuries. O'Hara admitted performing the services, but denied the allegations of negligence. The counts in the Venus complaint alleging property damage were dismissed following a settlement thereof, but it appears that the personal injury counts remain pending before the trial court, and the Venuses are not parties to this appeal.

O'Hara subsequently filed a third-party complaint for indemnity[1] against Wil-Kil Pest Control, Inc. (Wil-Kil), Wedor Corporation (Wedor), Benlo, and Kenova, asserting that Venus had filed a complaint against him for property damage and personal injuries allegedly resulting from the use of a container of Wil-Kil Napthalene Flakes; that the parties in question variously manufactured, sold, distributed, and/or repackaged the naphthalene flakes used in the Venus residence; and that the flakes were in the same condition at the time of their use as when they were manufactured, sold, and distributed by the third-party defendants. O'Hara further alleged that at the time the flakes left the possession and control of the third-party defendants, they were unreasonably and inherently dangerous in the following respects:

"a. Said products contained Naphthalene which the third-party defendants knew or should have known had harmful and deleterious effects on those who came into contact with or breathed the vapors from said materials.

b. Said products contained Naphthalene, which the third-party defendants knew or should have known would cause plaintiffs' residence to be rendered unfit for human habitation making it unsaleable and rendering plaintiffs' household articles unfit for human use.

c. Said products contained no warning or alternatively, the warning was insufficient in conveying knowledge to the user or public about the harmful and deleterious effects the chemical would have to persons and property when used to drive small

---

[1] A second count seeking contribution from the same parties was dismissed without prejudice, and that count was omitted from O'Hara's amended complaint.

animals from the inside of a residence.

d. Said product was manufactured, sold and distributed without testing or inspection to ascertain the effects it would have on the health and property of consumers and users when used to drive small animals from the inside of a residence.

e. That if injury or damage was suffered to the plaintiff's property or person as a proximate result of any defect or any unreasonably dangerous condition of the said Naphthalene flakes or their container or labeling, then this was because the third-party defendants, and each of them, failed. to manufacture, distribute and supply the third-party plaintiff with a safe and suitable product free from any unreasonably dangerous conditions."

The third-party complaint was later amended to allege that Wil-Kil distributed the naphthalene flakes in question to Dill Chemicals, Inc. (Dill), which in turn sold the flakes to O'Hara; however, Dill was not added as a third-party defendant.

In answer to the initial complaint for indemnity, Wedor admitted selling the flakes used in the Venus residence, but Benlo and Kenova neither admitted nor denied the allegation that they sold or distributed them. The answer of Wil-Kil is not contained in the record before us. After the amended complaint was filed, Benlo moved for summary judgment on the ground that it did not distribute naphthalene flakes directly to O'Hara. In support thereof, it cited O'Hara's answer to interrogatories in which he stated that the naphthalene flakes used in the Venus residence were purchased from Dill, and stated that it (Benlo) had never done business as or with Dill Chemical. No affidavits or other materials were attached to the Benlo motion, although the record does contain the affidavit of Kenneth Michaels, its president (the Michaels affidavit), in which he acknowledges that bulk sales of naphthalene flakes were made to Wedor and Wil-Kil from 1974 through 1978, but avers that no sales were ever made to Dill or to O'Hara. Attached to the affidavit are copies of invoices evidencing sales to Wedor and to Wil-Kill of 200-pound containers of naphthalene flakes. Kenova subsequently joined in the motion, asserting that if Benlo were granted summary judgment on the ground that it was not within the chain of distribution, it too would be entitled to summary judgment because it was "upstream" from Benlo in the alleged chain of distribution.

In response to the motions, O'Hara asserted that the facts established that Benlo was within the chain of distribution, relying on the Michaels affidavit which admitted sales to Wedor and Wil-Kil. O'Hara

further asserted that the evidence would show that Wil-Kil in turn sold the flakes to Dill. In support thereof, O'Hara attached the affidavit of his attorney, pursuant to Supreme Court Rule 191(b) (87 Ill. 2d R. 191(b)), in which it was averred that the facts which would refute the Michaels affidavit were known to Gordon Dill, former owner of Dill Chemical; that no affidavit could be obtained, and Mr. Dill was not in O'Hara's control; and that, if sworn, Mr. Dill would testify that he purchased the naphthalene flakes in question from Wil-Kil and sold them to O'Hara. The attorney based his belief that Mr. Dill would so testify on invoices evidencing sales from Wil-Kil to Dill, and from Dill to O'Hara.

At the hearing on the motions for summary judgment, the trial court did not rule on the grounds asserted by Benlo and Kenova. Instead, it found that, even accepting as true the chain of distribution alleged by O'Hara, no action for indemnity would lie directly against the bulk handlers, who had no control over the warnings or labels placed on the containers by their purchasers. It went on to note that Wil-Kil was the first link in the chain of distribution because it repackaged the naphthalene flakes received from Kenova and Benlo, attaching its own label and warnings, and thus superseded anything Kenova and Benlo might have done. However, the court further stated that Benlo and Kenova could be brought into the action by way of a fourth-party complaint filed by Wil-Kil and predicated on their failure to transmit adequate warnings to it. The trial court therefore granted the motions for summary judgment, and when O'Hara's motion to vacate was denied, this appeal followed.

OPINION

■ Initially, we address O'Hara's contention that the trial court erred in ruling that he could not seek indemnity from Kenova and Benlo based on their failure to give adequate warnings on the ground that the naphthalene flakes were repackaged by Wil-Kil after leaving their control. It is undisputed that the failure to warn of a product's dangerous propensities may be a basis for strict liability in tort (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194), and that strict liability therefor may be imposed upon all parties within the chain of distribution, including suppliers, distributors, wholesalers, and retailers (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210). However, the parties disagree as to the effect of a change in packaging on the liability of distributors for the failure to provide adequate warnings where, as here, the product is repackaged and the repackager has supplied the

warnings upon which the ultimate user relies. It is this narrow issue which we are asked to consider.

It is the parties' position that this question turns on a determination of whether repackaging constitutes a "substantial change" in the product. Benlo and Kenova assert, without citation to authority, that repackaging is a substantial change, and direct our attention to cases wherein it is held that when a subsequent alteration causes the injury complained of, the original manufacturer or distributor may not be held liable. (See, *e.g.*, *Curry v. Louis Allis Co.* (1981), 100 Ill. App. 3d 910, 427 N.E.2d 254; *Gasdiel v. Federal Press Co.* (1979), 78 Ill. App. 3d 222, 396 N.E.2d 1241.) O'Hara, also without citation to authority, argues that repackaging is not a substantial alteration, and relies on *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210, in arguing that a distributor has a nondelegable duty to make the product it handles safe through appropriate warnings.

■ We find the above authorities and arguments inapposite. In *Curry* and *Gasdiel*, we were concerned with a design defect created by later alteration in the product; whereas, here, it appears that there was no change in the naphthalene flakes or the dangerous propensities thereof as they passed through the chain of distribution. Furthermore, in *Hammond*, unlike here, the product complained of was not repackaged after it left the defendant's control. While a change in warnings might, under some circumstances, create liability, it is our view that resolution of this issue here is not dependent upon a determination of what constitutes a "substantial change," but upon a determination of the scope of the duty owed to ultimate users by manufacturers or distributors who do not control the packaging in which their products reach the consuming public.

The parties do not cite, nor has our own research discovered, any Illinois cases which address this issue. Therefore, we have looked for guidance to decisions in other jurisdictions where the question has been considered, and it appears that other courts have uniformly relied on section 388 of the Restatement (Second) of Torts, which states:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel *** or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." (Restatement (Second) of Torts sec. 388 (1965).)

On this rationale, other courts have held that, at the very least, a supplier has a duty to supply adequate warnings to its immediate vendee, and may be held liable to the ultimate user for its failure to do so. (See, *e.g., Dougherty v. Hooker Chemical Corp.* (3d Cir. 1976), 540 F.2d 174; *Parkinson v. California Co.* (10th Cir. 1958), 255 F.2d 265; *Shell Oil Co. v. Gutierrez* (1978), 119 Ariz. 426, 581 P.2d 271; *Jones v. Hittle Service, Inc.* (1976), 219 Kan. 627, 549 P.2d 1383; *Younger v. Dow Corning Corp.* (1969), 202 Kan. 674, 451 P.2d 177; *Reed v. Pennwalt Corp.* (1979), 22 Wash. App. 718, 591 P.2d 478.) While many of these cases state that the extent of the duty to warn is a question of fact (see, *e.g., Dougherty v. Hooker Chemical Corp.* (3d Cir. 1976), 540 F.2d 174; *Shell Oil Co. v. Gutierrez* (1978), 119 Ariz. 426, 581 P.2d 271; see also Restatement (Second) of Torts sec. 388, Comment *n* (1965)), most acknowledge that the duty will rarely extend beyond the communication of warnings to the immediate vendee, since, as a practical matter, the vendor has neither the means of controlling the vendee's subsequent actions nor the opportunity to provide warnings directly to the ultimate user (see, *e.g., Reed v. Pennwalt Corp.* (1979), 22 Wash. App. 718, 591 P.2d 478).

*Shell Oil Co. v. Gutierrez* (1978), 119 Ariz. 426, 581 P.2d 271, is a good example of the application of the above rule and closely parallels the facts of the instant case. The product in question therein was xylene, a chemical which is flammable in liquid form and highly explosive in vapor form. Shell Oil Company (Shell) manufactured the xylene and distributed it in bulk to the Christie Oil Company (Christie) in railroad tank cars and trucks which bore warnings that the product was flammable. Christie packaged the xylene in drums and placed labels thereon warning that it was flammable. The drums were then sold to Flint Oil Company (Flint) and, ultimately, to Westinghouse Electric Company, which used the liquid xylene as a solvent and then stored the empty drums for return to Flint. Vapor from the liquid residue collected in the stored drums and exploded when a Westinghouse employee was welding nearby, severely injuring two employees. The employees brought a strict liability action against Shell and the intermediate distributors, alleging failure to give adequate warning of the product's dangerous propensities, and a jury returned a verdict against all defendants.

On appeal, Shell contended that, as a matter of law, it could not be held liable because it had no control over the container in which the product would be resold and no means of communicating warnings to the ultimate users. The court disagreed and, relying on section 388 of the Restatement, ruled that Shell could be held liable for the failure to give adequate warnings to the intermediate distributors, stating:

> "The determination as to whether the supplier's duty *** has been reasonably discharge [sic] comes within the function of the trier of fact. [Citation.] There is adequate evidence in this record to support a finding that Shell failed to adequately warn Christie or Flint of the danger of explosion, the possible precautions, or the type of labeling that would be appropriate." 119 Ariz. 426, 434, 581 P.2d 271, 279.

We find the reasoning of the above cases persuasive, since they appear to be in harmony with the principles of strict product liability as they have developed in Illinois. In *Krammer v. Edward Hines Lumber Co.* (1974), 16 Ill. App. 3d 763, 306 N.E.2d 686, we held that a lumber supplier could be held liable to an ultimate user for its failure to warn an intermediate party that its product contained a defect which made it unfit for its foreseeable use as a stress-bearing member of a scaffold. While that action did not involve subsequent repackaging, it does demonstrate our belief that a party may be liable for the failure to warn its immediate vendee even where, as a practical matter, it had no opportunity to communicate those warnings to the ultimate user. Furthermore, we believe that such a rule does not place an unreasonable burden on the manufacturer or distributor; in most cases, its duty can be fulfilled by discovering the danger and giving warning thereof to the next party in the chain of distribution. As the supreme court noted in *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210:

> "The evidence established that defendant knew of the dangerous propensities of asbestos but chose not to warn of the hazard. In strict liability, sellers are liable not just to those in privity to whom they sell their products, but also to the ultimate user or consumer. [Citation.] Moreover, a manufacturer is under a nondelegable duty to produce a product which is reasonably safe. [Citation.] Given the facts in this case, defendant could not expect or rely on others to intervene and make its products safe." (97 Ill. 2d 195, 208, 454 N.E.2d 210, 217-18.)

Here, Kenova and Benlo assert in effect that they had a right to rely on Wedor and Wil-Kil to make their product safe by providing ade-

quate warnings, and they should therefore be absolved from any duty they might otherwise have. Nothing in the facts as yet presented, however, suggests that they were justified in relying on the expertise of subsequent distributors (see *Martinez v. Dixie Carriers, Inc.* (5th Cir. 1976), 529 F.2d 457), or that the dangerous propensities of naphthalene are so commonly known as to obviate the need for warning (see *Huff v. Elmhurst-Chicago Stone Co.* (1981), 94 Ill. App. 3d 1091, 419 N.E.2d 561), questions which, in any event, would be factual in nature. Therefore, we need not consider at this time what set of circumstances might justify reliance by Kenova and Benlo on Wedor and Wil-Kil.

■ Turning to the facts of the instant case, we must determine whether summary judgment was proper, *i.e.,* whether Benlo and Kenova fulfilled their duty to warn their immediate vendees. The standard to be applied in considering this question was set forth recently in *Motz v. Central National Bank* (1983), 119 Ill. App. 3d 601, 605, 456 N.E.2d 958, 961-62:

> "The motion should be granted where the pleadings, exhibits, depositions, and affidavits of record show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. [Citation.] However, because this is a drastic measure, it is to be granted only where the evidence, when construed most strongly against the moving party, establishes clearly and without doubt his right thereto. [Citations.] Furthermore, where the movant seeks to establish evidentiary facts by way of affidavit, Supreme Court Rule 191 requires that the affidavits relied upon consist of facts admissible in evidence, not mere conclusions [citation]; and although facts in an affidavit which are not contradicted by counteraffidavit will be taken as true despite contrary averments in the pleadings [citation], the movant must present evidence which precludes any possible liability before the party opposing summary judgment is required to present some factual basis by way of counteraffidavit which would arguably entitle him to judgment [citation]. Thus, we have held that 'even though the party opposing the motion for summary judgment fails to file counteraffidavits, the moving party should not be awarded summary judgment unless the affidavits filed in support of the motion establish the judgment as a matter of law.' "

It is our view that a genuine issue of material fact remains as to whether Benlo and Kenova supplied adequate warnings.

It appears from Benlo's answers to interrogatories that Kenova

did provide product information to Benlo which warned that overexposure to naphthalene could cause irritation to the eyes, skin, and respiratory tract, dizziness, weakness, fatigue, nausea, headache, and possible unconsciousness. The warning also informed Benlo that overexposure had been found to cause anemia and eye damage in laboratory animals, and kidney, spleen, and eye damage in humans, and it recommended that "[s]ufficient mechanical (general) and/or local exhaust ventilation [be provided] to maintain exposure below [a threshold limit value of 10 parts per million]." It is significant, however, that in those same interrogatories, Benlo's president stated that he "did not know" whether warnings of any kind were transmitted by Benlo to subsequent purchasers. The Michaels affidavit states that 200-pound containers of naphthalene flakes were shipped to both Wedor and Wil-Kil. While it is not clear from the record which of those entities was responsible for repackaging the flakes under the Wil-Kil label, various invoices attached to the Michaels affidavit indicate direct shipments to both Wedor and Wil-Kil. Documents provided by Wedor pursuant to discovery evidence sales to Wil-Kil of naphthalene flakes in 100-, 50-, and 25-pound containers, apparently not in the 200-pound containers which it received from Benlo, raising an inference that Wedor did the repackaging. However, one invoice bears the notation "Naphthalene (Repackaged from 100# supplied by Wil-Kil)," so that it is possible that Wil-Kil received some product directly from Benlo and passed it on to Wedor for repackaging.

In its answer to interrogatories, Wil-Kil stated that it received warnings only from the Environmental Protection Agency, and that those warnings were placed on its label, *i.e.*:

"KEEP OUT OF REACH OF CHILDREN. Avoid prolonged breathing of vapor or spray. Avoid contact with eyes. Rooms with treated furniture should be well ventilated before occupancy."

The label also stated that for elimination of small animal pests, approximately 5 pounds of flakes per 2,000 cubic feet of space should be spread on the floor or applied between walls. It appears that O'Hara used 10 to 15 pounds of flakes in the Venus attic, which had approximately 2,099 cubic feet of space.

With regard to Benlo's motion, we believe that the facts thus far presented raise a material question of fact as to whether any warnings were sent to Benlo's immediate vendee. Benlo's president stated that he did not know whether warnings had been sent, and Wil-Kil said it received no warnings. However, this is not conclusive on the question, since the product may have been sent directly to Wedor for

repackaging under the Wil-Kil label. Benlo suggested at oral argument that we "presume" that the warnings provided by Kenova were attached to the containers and therefore passed on to subsequent purchasers. We may not indulge in such an unsupported assumption on a motion for summary judgment; the moving party in the first instance must present facts which *clearly* and *without a doubt* establish its right to judgment. Since it appears that some shipments were made directly to Wil-Kil by Benlo, and Wil-Kil has stated that it received no warnings, an assumption that the warnings were attached to the product is clearly unwarranted.

Kenova is in a somewhat different position, since the record does establish that it provided warnings to Benlo, its immediate vendee. Kenova concedes that, ordinarily, the sufficiency thereof would be a question of fact, and we note that there is nothing in this record which establishes that the warnings were adequate or even whether the injuries alleged by the Venuses are within the risks which were the subject of Kenova's warnings. Nevertheless, Kenova maintains that summary judgment was proper as to it because Benlo's failure to forward Kenova's or any other warnings to subsequent purchasers was a superseding cause of the injury, precluding liability on its part. We agree with its argument that if the record established Benlo's failure to pass on any warnings, the sufficiency of the Kenova warnings would be immaterial, since under those circumstances they were not relied upon downstream and would not have been a proximate cause of the injury. However, as noted above, a genuine issue of fact remains as to whether Benlo passed on the warnings it received from Kenova, and because the record does not otherwise show that the Kenova warnings were adequate, it is our view that neither Kenova nor Benlo has established as a matter of law that it was entitled to judgment, either because it fulfilled its duty to warn or because other facts existed which would obviate the need for warnings.

Finally, Benlo argues that even if the trial court erred in its ruling, we may still affirm on the ground it initially asserted; namely, that O'Hara failed to show that it was within the chain of distribution. As it did before the trial court, Benlo relies on the lack of evidence that it sold to Dill and O'Hara's admission that he purchased from Dill. Benlo strenuously argues that the affidavit of O'Hara's attorney is insufficient to establish the distributive chain from Wil-Kil to Dill to O'Hara because it did not comply with Supreme Court Rule 191(a) (87 Ill. 2d R. 191(a)). Benlo did not address the question of the sufficiency thereof under Rule 191(b) (87 Ill. 2d R. 191(b)), the section under which the affidavit in question was filed.

We find the above arguments irrelevant. Before the party opposing summary judgment is required to establish contrary facts by way of counteraffidavit, the moving party must present evidence which precludes any possible liability on its part. (See *Motz v. Central National Bank* (1983), 119 Ill. App. 3d 601, 456 N.E.2d 958.) Thus, the sufficiency of O'Hara's counteraffidavit is material only if the evidence otherwise established that Benlo was not within the chain of distribution. In another affidavit, the sufficiency and content of which are not challenged, O'Hara stated that he used a container of Wil-Kil Naphthalene Flakes in the Venus residence, and the record also contains the signed statements of two of O'Hara's employees which state that the product used was Wil-Kil 100% Naphthalene Flakes. Benlo has made no showing that the flakes used were not in a Wil-Kil container; that the Wil-Kil container did not contain flakes placed there by Wil-Kil; or that the flakes were changed in any way after they left the control of Wil-Kil but before they reached O'Hara. Benlo has admitted, by way of affidavit, sales of naphthalene flakes to Wil-Kil and Wedor, and Wedor—in its answer to the complaint—admitted that it sold the flakes in question. Benlo has presented nothing which would suggest that Wil-Kil or Wedor had sources of supply other than Benlo. It is our view that these facts are insufficient to establish that Benlo is not within the chain of distribution; indeed, they indicate the contrary. The fact that Benlo has shown it did not sell directly to Dill or O'Hara is not controlling, as it admitted sales of flakes to Wedor and Wil-Kil, either of whom may have repackaged under the Wil-Kil label and then sold to Dill the flakes it passed on to O'Hara. Therefore, it is of no consequence that O'Hara's attempt to show that a distributive chain from Wil-Kil to Dill to O'Hara did not comply with Rule 191(a). Benlo was not entitled to summary judgment on this ground.

For the foregoing reasons, the order granting summary judgment to Kenova and Benlo is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

MEJDA, P.J., and LORENZ, J., concur.