# Illinois Official Reports

## Appellate Court

---

### *Zahumensky v. Chicago White Sox, Ltd.*, 2019 IL App (1st) 172878

---

| | |
|---|---|
| Appellate Court Caption | THOMAS ZAHUMENSKY and CATHY ZAHUMENSKY, Plaintiffs-Appellants, v. CHICAGO WHITE SOX, LTD.; ILLINOIS SPORTS FACILITY AUTHORITY; BENNETT & BROUSSEAU ROOFING, INC.; and SIKA CORPORATION, Defendants (Chicago White Sox, Ltd.; Bennett & Brousseau Roofing, Inc.; and Sika Corporation, Defendants-Appellees). |
| District & No. | First District, First Division<br>Docket No. 1-17-2878 |
| Filed | February 19, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-5911; the Hon. William E. Gomolinski, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | David C. Wise, of Wise Morrissey Kaveny, LLC, of Chicago, and Michael T. Reagan, of Ottawa, for appellants.<br><br>Hinshaw & Culbertson LLP, of Chicago (Gretchen Harris Sperry, Robert T. Shannon, and Chad D. Kasdin, of counsel), for appellee Chicago White Sox, Ltd.<br><br>Richard J. Turiello, of Krakar, Fanning & Olsen, of Chicago, for appellee Bennett & Brosseau Roofing, Inc. |

Daniel K. Cray and Melissa H. Dakich, of Cray Huber Horstman Heil & VanAusdal, LLC, of Chicago, for other appellee.

Panel          PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Griffin and Walker concurred in the judgment and opinion.

**OPINION**

¶ 1      As part of his job duties, Thomas Zahumensky, a maintenance electrician hired to service the outfield scoreboard of U.S. Cellular Field, was required to walk on the polyvinyl chloride (PVC) membrane-covered outfield roof of the ballpark to check and repair the scoreboard lights before Chicago White Sox home games. Mr. Zahumensky was performing these duties in the summer of 2013 when he slipped on a wet area of the roof and suffered career-ending nerve damage. He and his wife brought negligence and strict liability claims against Sika Corporation (Sika), the manufacturer of the PVC roofing material; Bennett & Brousseau Roofing, Inc. (Bennett), the contractor that installed the roof; and Chicago White Sox, Ltd. (White Sox), the baseball team that leases and operates the ballpark. Among other things, the Zahumenskys contended that Sika and Bennett had a duty to pass along information from which the White Sox should have determined that the PVC surface of the roof, which becomes very slippery when wet, was an unsafe work surface because it had no slip-resistant walkways. In three separate orders, the circuit court granted summary judgment in each defendant's favor, and Mr. Zahumensky now appeals. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶ 2                    I. BACKGROUND

¶ 3      The following facts are taken from the deposition transcripts, affidavits, and exhibits relied on by the parties in their summary judgment briefing.

¶ 4                 A. Mr. Zahumensky's Fall

¶ 5      On June 29, 2013, Mr. Zahumensky, an employee of a sign company hired by the White Sox to do electrical maintenance work at the ballpark, was walking on the roof to check the left field scoreboard before an afternoon home game when he slipped and fell, suffering a severe hamstring avulsion injury that required several surgeries and has prevented him from returning to work as an electrician, a job he had been doing for 30 years before his fall. At his deposition, Mr. Zahumensky testified that he had walked on the outfield roof on many prior occasions over the years, both before and after the new PVC membrane was installed, that he knew that the material was very slippery when wet, and that he knew that one had to walk carefully and take small steps when water was present. On the day in question the weather was clear and the roof appeared dry. Mr. Zahumensky was not aware of any rain the night before. He put his foot down on a patch of water that was difficult to detect against the white PVC material and

- 2 -

recalled that it was "slick like oil." Mr. Zahumensky "did the splits and *** fell right in it," his pants and the back of his shirt absorbing the water.

¶ 6     Mr. Zahumensky stated that he never received training or safety instructions from the White Sox or his employer regarding how to access the scoreboard for repairs. Although White Sox employees would occasionally help troubleshoot issues from inside the scoreboard room, Mr. Zahumensky was the only person who regularly accessed the roof to work on the scoreboard. Mr. Zahumensky testified that some of the roofs he had walked on for other clients had textured walkways for maintenance workers to use. At no time, however, did he complain to the White Sox or his employer about the lack of such walkways on the ballpark's roof.

¶ 7     Jeffrey Szynal, senior manager of scoreboard and TV production for the White Sox, worked regularly with Mr. Zahumensky to troubleshoot scoreboard issues. On the day in question, when Mr. Szynal told Mr. Zahumensky that the scoreboard needed to be repaired, he had no idea if the roof was slippery or if there were slip-resistant walkways installed there. In his more than 30 years as a White Sox employee, Mr. Szynal had only been on the ballpark roof three times: in 1991 when it was built and in 2003 and 2016 when new scoreboard screens were installed. He explained that, as a matter of company policy, the roof is a place that White Sox employees are generally not permitted to go.

### B. The PVC Membrane Roof

¶ 8

¶ 9     U.S. Cellular Field (now Guaranteed Rate Field, referred to here simply as the ballpark) is owned by the Illinois Sports Facility Authority (ISFA) and is managed and operated by the White Sox. ISFA representative Charles Sampey testified at his deposition that, through an arrangement between the two, the ISFA reimburses the White Sox for capital repairs to the ballpark. In the years leading up to 2010 it was determined that the PVC membrane covering the low-sloped concrete roof over the ballpark's outfield deck should be replaced. The project was slated as an "in kind" replacement. Any modification or improvement of the existing roof—including the addition of slip-resistant walkways—was not covered and would have required additional approval by the ISFA. To Mr. Sampey's knowledge, no such request was ever made.

¶ 10     In November 2010, Bennett submitted a proposal for the job, in which it recommended removing the existing two layers of PVC roofing system down to the precast concrete roof deck, replacing any deteriorated insulation, and installing a new, Sika-manufactured PVC membrane. Bennett was awarded the job and, on November 23, 2010, entered into a contract with the White Sox for the outfield roof replacement, which took place in the spring of 2011.

¶ 11     Donald Esposito, the senior director of purchasing, construction, and maintenance for the White Sox, coordinated the bid process and roof replacement. At his deposition, Mr. Esposito could not recall whether Bennett ever recommended to the White Sox that a slip-resistant walkway be installed along the length of the new roof. According to Mr. Esposito, a recommendation like that would have been made in writing. And if the White Sox declined such a recommendation, that decision would also have been conveyed in writing. Mr. Esposito agreed that the installation of walkways on the outfield roof of the ballpark would have been considered a capital improvement that would have required ISFA approval. Mr. Esposito sought and was granted such approval in 2014, after Mr. Zahumensky's accident. When asked why the walkways were installed in 2014, he said he "[j]ust thought it was a better idea putting them up there since this occurred."

¶ 12    In 2011, however, walkway material was only installed at the tops and bottoms of the ladders used to access the scoreboards. Mr. Esposito agreed that SarnaTred walkways were listed as an optional item on the Bennett proposal but had no knowledge as to whether Bennett recommended them. Mr. Esposito stated that although he probably went through the proposal with Mr. Sampey, he could not recall whether he had also recommended to the ISFA that SarnaTred be installed. Mr. Esposito's view was that the ISFA owned the ballpark and had the money, so it, not the White Sox, decided what would be purchased.

¶ 13    Mr. Esposito stated that twice a year he has the White Sox's carpenter foreman get on the roof to inspect it, taking photographs of any debris, clogged drains, or damage to the membrane. Mr. Esposito has himself been on the roof when it was wet and stated that he "did not have any issues." He agreed, however, that at the time he knew the roof was wet and walked more carefully than he otherwise would have.

¶ 14    Sika manufactured the PVC membrane that covered the ballpark outfield roof. Sika sales representative Eric Hurst testified at his deposition that he was approached by Bennett to supply the PVC membrane. Mr. Hurst had no contact with anyone at ISFA or the White Sox during the course of the project, and Sika played no role in selecting the material that would be used. According to Mr. Hurst, Sika simply prices and supplies requested materials; it never gives design advice or makes design recommendations to contractors, other than to indicate whether a proposed application will meet warranty requirements.

¶ 15    Sika's roofing applicator handbook provides that "[w]alkways shall be provided for regular maintenance of rooftop equipment and for roof areas subject to foot traffic." Sika manufactures two walkway products for this purpose: SarnaTred and Crossgrip. An undated copy of a brochure for Crossgrip boasts that the product will "[i]mprove rooftop traction while preventing unnecessary accidents" and that "[i]nstallation is as simple as rolling out the mat. No adhesive or mechanical attachment is necessary." According to Sika, the product is "impervious to all weather and provides permanent slip resistance, even in areas where ponding water may occur." A December 2010 product data sheet for SarnaTred indicates that that product, by contrast, is welded to the PVC surface and is designed to protect the PVC membrane "from mechanical abuse." The data sheet for SarnaTred makes no mention of slip resistance. Contractors have access to information about both of these products on Sika's website.

¶ 16    Mr. Hurst could not remember when Crossgrip first became available but knew that SarnaTred was available when the ballpark roof replacement took place. Mr. Hurst also testified that "there [are] a lot of different products in the marketplace" to make PVC less slippery when wet—and that application of these products will not void the product warranty if they are installed correctly—including "wood decks, pavers, [and] river rock." He explained that the installation of walkways—SarnaTred, Crossgrip, or otherwise—is not a Sika warranty requirement.

¶ 17    When the roof replacement was finished, Sika inspected the roof and issued a 20-year warranty on parts and labor. A letter to Steve Niggins at Bennett, dated June 16, 2011, and signed by Sika warranty supervisor Michelle Cavacas, asked Bennett to "[p]lease forward the Original Warranty, owner's Guide, Maintenance Checklist, Caution Sign, Photovoltaic Installation/Warranty Continuation Policy *** and the Warranty Folder to the building owners and keep the duplicate for your records." The continuation policy was a three-page document explaining how, if a building owner wished to install solar panels on a roof, it could ensure that

the new installation was consistent with Sika warranty requirements. The statement in that document that "[a]dditional Sarnatred or Crossgrip walkways should be installed in areas of expected heavy foot traffic" indicates that SarnaTred and Crossgrip were both available at the time of the outfield roof replacement.

¶ 18 The caution sign enclosed with the warranty materials was a large yellow and black sticker that said in boldfaced letters:

"CAUTION

PROTECT YOURSELF!

ROOF AND WALKWAYS MAY BE SLIPPEY WHEN ICY, SNOW COVERED, OR WET. WHEN THESE CONDITIONS EXIST:

* NOTIFY SUPERVISORY PERSONNEL

* LIMIT ROOF-TOP ACCESS TO EMERGENCIES

* PROCEED WITH UTMOST CAUTION."

When shown the sticker at his deposition, Mr. Niggins could not remember having seen it before, though he had seen similar warning stickers affixed to roof hatches at other project sites.

¶ 19 At the time of his deposition, Mr. Niggins no longer worked for Bennett, but he had been the project manager for the ballpark roof replacement. Bennett's vice president, Chris Eheart was the salesperson responsible for working with the White Sox to develop a proposal and select the materials that would be used. It was Mr. Niggins's job to simply install the product as directed. According to him, this situation was "a little unique" because a Bennett salesperson was usually "cradle to grave," meaning "if you sold it, you project-managed it." Mr. Niggins could recall no specifics but believed that the situation arose because Mr. Eheart was busy and "didn't really have time to project-manage" this particular project.

¶ 20 Mr. Niggins explained that the role played by Bennett differs depending on whether a project is negotiated or bid work:

"There's negotiated work which you go in and you actually sell—you can sell with the client and decide what the best product is for their roof. And then there's bid work, which they say, [t]his is what you have to use.

* * *

*** Bid work is when you're supplied with the plans and specs—here's your specifications; this is what you have to use; here's your plans; here's where everything goes together—as opposed to going out and talking to a private client and going up on their roof and surveying their roof and telling them what they need."

¶ 21 When asked which type of project the ballpark roof replacement was, Mr. Niggins stated: "I would have to probably put that under negotiated work because we weren't working off of a set of plans and specs." According to Mr. Niggins, whether walkways were needed in high-traffic areas was something that a Bennett salesperson would discuss with a client in negotiated work, by asking the client questions about how the roof would be used. Although Bennett relied on the information provided by its clients, Mr Niggins agreed that some clients are more sophisticated than others.

¶ 22 Mr. Niggins did not know whether Mr. Eheart recommended to the White Sox that slip-resistant walkways be installed in connection with the outfield roof replacement. As

approved, the proposal called only for SarnaTred walkway pads to be installed at the step-offs for ladders. Mr. Niggins could not remember if Sika's other walkway product, Crossgrip, was available in 2010 but believed that the company also offered at that time a "sanded surface" product.

¶ 23    Mr. Eheart testified at his deposition that he met with Mr. Esposito in the fall of 2010 to inspect the roof and develop a proposal for its replacement. It was Mr. Eheart's understanding that the roof was being replaced due to its age. Bennett had not installed the old PVC membrane roof that was being replaced but had done other, minor work for the White Sox in the past. Mr. Eheart could not recall exactly what was said and was not aware of any documents memorializing his conversation with Mr. Esposito.

¶ 24    Mr. Eheart's original proposal, sent to the White Sox on October 18, 2010, was for an adhered roofing system, in which the PVC membrane is glued to the roof. On November 4, 2010, he sent a second proposal that included a less expensive fastened roofing system option, in which the PVC membrane would be held down with screws and plates. A third and final proposal, sent on November 9, 2010, reflected a change in the unit price for the materials. This proposal also included some additional small items, like a roof drain that needed to be replaced. Mr. Eheart explained that "[t]hose were all items that somehow in the negotiation process they must have been requested." Accompanying the final proposal were Bennett's responses to questions raised in a report prepared by the architectural firm the White Sox consulted with on the project. Each of the three proposals included pricing for some optional materials, including "Add price to install SarnaTred walkway as directed by owner, $18.00 per lineal foot," and attached the product data sheet for Sika's SarnaTred walkway product. The purchase order incorporated into the final contract between Bennett and the White Sox similarly indicated that SarnaTred would be priced by the lineal foot and applied only at the White Sox's direction.

¶ 25    The previous roof at the ballpark was also a Sika PVC membrane, and Mr. Eheart believed that Mr. Esposito requested that the replacement be by the same manufacturer. According to Mr. Eheart, Bennett employees are familiar with Sika products because they have been installing them for years. Product information is available on Sika's website, in brochures and technical bulletins, and from Sika sales representatives, who make in-person visits. Mr. Eheart himself becomes aware of new Sika products through annual trade shows, which he has attended for 23 years, but he has never received training from Sika regarding when to install walkways. Mr. Eheart stated that if Sika had recommended the use of slip-resistant walkways for the safety of workers, he would have passed that information along to the White Sox. He agreed that his proposal did not directly address worker safety.

¶ 26    Mr. Eheart's understanding was that SarnaTred is applied to protect the PVC membrane. It has a textured surface but, like the roof itself, is made of PVC. Mr. Eheart opined that it "could be just as slippery as the membrane" and said he would not have recommended it to the White Sox as a slip-resistant surface to address safety concerns.

¶ 27    Mr. Eheart said that Sika's other product, Crossgrip, was a product sold by multiple manufacturers and was "sort of a new thing in the industry *** maybe in the last five years." He could not remember if it was available when he drafted the proposal for the ballpark roof replacement and could not remember when he first became aware of it. Since becoming aware of it, however, he does not believe he has recommended it to any client or included product

data sheets for it in any of his proposals, even though he has been aware that some of his clients frequently have workers walking on their roofs.

¶ 28    Although Mr. Eheart knew, based on his inspection of the ballpark roof and its high traffic areas, that the installation of SarnaTred or some other walkway pad would be appropriate and was in fact recommended by Sika, he could not recall whether he had any discussion with Mr. Esposito regarding the need to install walkways. He provided the information on SarnaTred and let Mr. Esposito decide whether it should be included in the project. Mr. Eheart expected a client like the White Sox to know that the phrase "mechanical abuse" in the SarnaTred literature included workers regularly walking on the surface of the PVC membrane. He believed that the SarnaTred installed at the ladder access points was not chosen by Bennett or the White Sox but was a warranty requirement of Sika's. Someone from Sika would have come out once the project was completed to inspect the roof before issuing a warranty.

¶ 29    When asked if he thought Mr. Esposito should have known that installing walkways would have made the roof safer, Mr. Eheart stated: "I don't know what Don would know. He had a [Sika PVC-membrane-covered] roof before we installed this one. He would have working knowledge of how that performed. We just basically replaced the [old] membrane with new membrane." Mr. Eheart was not surprised, however, when the White Sox elected not to purchase the SarnaTred walkways. A lot of clients do not select them because it is an additional expense.

¶ 30    The Zahumenskys retained two experts: Brent Johnson, who performed slip-resistance tests on Sika's PVC roof membrane and walkway products, and Russ Kendzior, an expert on workplace safety standards, who used Mr. Johnson's data to form his opinions. Mr. Kendzior testified at his deposition that the membrane itself made a "great roof." But unlike most roofs, the ballpark's PVC roof was also a walking and working surface. PVC membrane has only moderate traction. As a walking surface, materials in this range are safe only when used indoors. A roof cannot be kept dry, but a floor can be. For a roof, which will necessarily get wet, a high-traction walking surface is necessary. In Mr. Kendzior's opinion, without a slip-resistant walkway, the ballpark roof was safe to walk on when dry but unreasonably slippery when wet.

¶ 31    Mr. Kendzior testified that what was needed was a product like Crossgrip—a raised grate that would allow water to drain through. He candidly referred to a sample of the textured walkway material known as SarnaTred as "crap" that "doesn't work" and "has a very low co-efficient of friction." According to Mr. Kendzior, the Crossgrip name is "like Kleenex," in that it is Sika's version of a widely used product sold under different names by different companies. His opinion was that, from the presence of ladders and mechanical equipment on the roof, Bennett knew or should have known that walkways were required for regular maintenance and failed to adequately inform the White Sox of the need to install them. Bennett should have offered the White Sox both SarnaTred and Crossgrip. The White Sox, conversely, should have known enough to ask Bennett for a high-traction walkway product. In Mr. Kendzior's opinion, both parties failed to have the discussion they should have had about the safety ramifications of workers using the roof on a regular basis.

¶ 32    Mr. Kendzior agreed there was no industry standard expressly requiring high-traction walkways, only voluntary or recommended standards. He also agreed that the primary purpose of walkways is to protect the PVC membrane from damage, though he noted that an important secondary purpose is the safety of workers.

¶ 33

¶ 34     Mr. Zahumensky brought negligence claims against Sika, Bennett, the White Sox, and the ISFA, as well a claim for strict product liability against Sika. Mr. Zahumensky's wife, Cathy Zahumensky, brought corresponding claims for loss of consortium against these same parties. The claims against the ISFA were subsequently dismissed, on the grounds that it enjoyed statutory immunity, and Mr. Zahumensky does not challenge that ruling on appeal.

¶ 35     The Zahumenskys alleged that Sika sold its PVC roof membrane "without a sufficient or adequate textured slip/skid resistant walkway," "without sufficient or adequate warnings as to how slippery it was when wet," and "without adequate or suitable warnings and instructions to sellers, distributors, applicators and buyers of the availability of and need for slip resistant walkways in foot traffic areas."

¶ 36     They alleged that the White Sox and Bennett knew or should have known that Mr. Zahumensky and other workers like him had to walk on the outfield roof in order to perform their assigned duties and that the PVC membrane covering the roof was extremely slippery when wet. The Zahumenskys further alleged that irregularities in the roof caused water to "pool unnaturally" in some areas and that Mr. Zahumensky fell on an "unnatural accumulation of water." According to the Zahumenskys, the White Sox were negligent for failing to "provide [him] with a safe place to work," failing "to provide a textured slip/skid resistant walkway" on the roof, allowing an unnatural accumulation of water to form, failing to adequately inspect the area, failing to correct the conditions causing the unnatural accumulation of water, and failing to warn Mr. Zahumensky that there was water on the roof. They alleged that Bennett was negligent because it "[f]ailed to correct the condition(s) in the subject roof which caused water to unnaturally accumulate," "[f]ailed to recommend to Chicago White Sox additional textured slip/skid resistant walkways" or warn that such walkways "were necessary for [the] safety of workers," "[f]ailed to warn the Chicago White Sox of the defects on the roof which led to the pooling of water," and "[f]ailed to provide sufficient or adequate textured slip/skid resistant walkways" on the roof.

¶ 37     Sika moved for summary judgment, arguing that it had no duty to insure the safety of the White Sox's business invitees; that its roof was a building component, not a "product" subject to a claim of strict product liability; and that the PVC membrane it sold was not physically flawed or defective but had in fact performed well as a roof. Sika maintained that, because it played no part in the design of the roof or in the selection or installation of the PVC membrane, it had no duty to warn the White Sox of the need for slip-resistant walkways. In any event, Bennett, a certified installer of Sika's products, knew that the PVC membrane was slippery when wet and was aware that, in its product literature, Sika offered and recommended that walkways be installed in areas of foot traffic. Sika also argued that it had fulfilled any duty to warn it may have had by providing Bennett a caution sticker expressly addressing the slipperiness of the roof and the need for walkways, which was supposed to be passed on to the building owner.

¶ 38     Bennett's motion for summary judgment rested on its insistence that it had no duty to the Zahumenskys because it was not the owner or operator of the ballpark and had not voluntarily undertaken the responsibility of safeguarding workers accessing the ballpark roof. Bennett argued that it had been hired to do one thing: replace the PVC membrane on the roof "in a professional manner and in accordance with the plan and specifications of the project."

Bennett's position was that it had given the White Sox information about SarnaTred walkways and the White Sox had made the decision not to include them.

¶ 39 The White Sox also moved for summary judgment on the basis that it had no duty to warn Mr. Zahumensky because it had no actual or constructive notice of standing water on the ballpark roof on the day in question.

¶ 40 Counsel for the Zahumenskys argued that it did not matter whether the White Sox knew about standing water on the day in question because the standing water was not the defective condition. Rather, the absence of slip-resistant walkways was the defective condition, and the White Sox knew or should have known that the roof—which would necessarily sometimes be wet—was an unsafe walking surface absent the installation of such walkways. Counsel argued that summary judgment was not proper because questions of fact existed regarding (1) whether Sika and Bennett had passed along information about the need for and availability of slip-resistant walkways to the next party in the project's sequence, (2) what Bennett and the White Sox knew about the availability of and need for slip-resistant walkways, and (3) whether the White Sox, as the operator of the ballpark, ultimately made an informed decision to not include them. As counsel explained to the circuit court judge:

> "[S]omeone had a duty to make the roof reasonably safe for Tom Zahumensky. Now, if you think that the roof is reasonably safe as it is, then I suspect the entire case ends. If the roof is not reasonably safe or if it's a question of fact, which I think it is, then the question is, who had the duty to make it reasonably safe and then who discharged their duty."

Counsel also argued that the defendants' focus on whether each of them owed a duty directly to the Zahumenskys was misguided because Bennett, for example, may have owed a duty to warn the White Sox, the breach of which was a proximate cause of Mr. Zahumensky's injury.

¶ 41 The circuit court granted summary judgment in favor of each of the defendants. With respect to Sika, it found both that the PVC membrane was a building component and not a "product" susceptible to a claim of strict product liability and that Sika owed no duty to third-party invitees of the end users of its products. The court found that the White Sox had no duty to Mr. Zahumensky because they had no notice of a dangerous condition ("I don't think there [is] any duty. I think it's based upon actual or constructive notice as to whether or not that [*sic*] that roof is slippery when—you know, when—or whether there was this natural or unnatural accumulation on this roof."). With respect to Bennett, the court relied on *Hunt v. Blasius*, 74 Ill. 2d 203 (1978), and *Thompson v. Gordon*, 241 Ill. 2d 428 (2011), cases Bennett had not cited, but that the court felt stood for the proposition that Bennett had no liability because it was not involved in the design or selection of the roof but was simply hired to replace the PVC membrane with exactly what was there already.

¶ 42                                          II. JURISDICTION

¶ 43 The circuit court granted summary judgment in favor of Bennett, the White Sox, and Sika in a series of orders culminating with the disposal of all remaining claims against Sika on October 3, 2017. At that time, Mr. Zahumensky's motion for reconsideration or clarification of the court's prior order granting summary judgment in favor of Bennett was still pending. The circuit court denied that motion on October 23, 2017, and Mr. Zahumensky timely filed his notice of appeal on November 2, 2017. We have jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303, governing appeals from final judgments entered by the circuit court

in civil cases. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017).

¶ 44                                    III. ANALYSIS

¶ 45        At issue in this appeal is whether summary judgment was properly entered in favor of each defendant on the Zahumenskys' negligence claims and—in the case of Sika—on their additional claim for strict product liability.

¶ 46        Summary judgment is appropriate where, construed liberally in favor of the party opposing judgment (*Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25), "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (735 ILCS 5/2-1005(c) (West 2016)). Although summary judgment is "encouraged as an aid in the expeditious disposition of a lawsuit," it is "a drastic means of disposing of litigation and, therefore, should be allowed only when the right of the moving party is clear and free from doubt." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). "[W]here reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 424 (1998). Our review of a circuit court's grant or denial of summary judgment is *de novo*. *Doria v. Village of Downers Grove*, 397 Ill. App. 3d 752, 756 (2009).

¶ 47        To succeed on a claim of negligence, a plaintiff must generally prove that (1) the defendant owed a duty of reasonable care to the plaintiff, (2) the defendant breached that duty, and (3) the breach was the proximate cause of the plaintiff's injury. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000).

¶ 48        In this case, the Zahumenskys seek to hold three parties liable: the White Sox as the possessor of land on which Mr. Zahumensky was injured, Bennett as a contractor who performed work for the White Sox, and Sika as a manufacturer supplying the materials for that work. The duty of reasonable care has been defined differently in each of these contexts.

¶ 49        A possessor of land is liable for injuries to invitees resulting from a dangerous condition on the land when it

> "(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts § 343 (1965).

¶ 50        A contractor "who on behalf of the possessor of land erects a structure or creates any other condition" on the possessor's land is subject to liability to invitees

> "for physical harm caused to them by the dangerous character of the structure or condition after [the contractor's] work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others." *Id.* § 385.

¶ 51        A manufacturer is liable to the end users of its product for negligence if it "(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its

dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." *Id.* § 388.

¶ 52 To recover on a product liability action against a manufacturer, a plaintiff must prove "that the injury resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time the product left the manufacturer's control." *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002). "A product may be found unreasonably dangerous by virtue of a physical flaw, a design defect, or a failure of the manufacturer to warn of the danger or instruct on the proper use of the product as to which the average consumer would not be aware." *Id.*

¶ 53                                    A. Sika

¶ 54 In granting Sika's motion for summary judgment, the circuit court concluded both that the PVC membrane was not a "product" separate and divisible from the roof of the building and that Sika had no duty to warn the third-party invitees of the end users of its products regarding potentially dangerous design applications of those products. The Zahumenskys' theory is, of course, not that Sika's PVC membrane is physically defective as a roof. Their claims against Sika—for both negligence and for product liability—are based on a failure to warn that the PVC is unsafe to walk on without slip-resistant walkways. "A manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm may occur absent a warning." *Id.* Because we hold that the undisputed facts demonstrate that Sika adequately discharged its duty to warn, summary judgment in Sika's favor was proper. We need not decide whether the PVC membrane itself qualifies as a product.

¶ 55 As an initial matter, we are unpersuaded by Sika's insistence that it had no duty to warn because its PVC membrane was never intended to be used as a work surface, and by Sika's insinuation that allowing workers to walk on its roofs was an unusual "secondary use" that Sika could not have anticipated. There is evidence that Sika was fully aware that workers walk on its PVC membranes, and in fact, it is undisputed that Sika offers walkway products specifically designed to accommodate this use.

¶ 56 The necessary warning in this case would have been to Bennett, the purchaser of Sika's PVC membrane. We agreed, in *Venus v. O'Hara*, 127 Ill. App. 3d 19, 25-26 (1984), with a line of cases holding that "at the very least, a supplier has a duty to supply adequate warnings to its immediate vendee, and may be held liable to the ultimate user for its failure to do so." We reasoned that a manufacturer's duty to warn "will rarely extend beyond the communication of warnings to the immediate vendee, since, as a practical matter, the vendor has neither the means of controlling the vendee's subsequent actions nor the opportunity to provide warnings directly to the ultimate user." *Id.* at 25.

¶ 57 Here, the undisputed facts demonstrate that Sika did warn Bennett, its immediate vendee, that PVC membranes are slippery when wet, that this presents a danger to workers walking on the roof, that walkways should be used in areas of high foot traffic, and that slip-resistant walkways were available to prevent accidents. Sika recommended the use of walkways in high traffic areas in its roofing applicator handbook and advised in its product data sheets that Crossgrip provided a slip-resistant walking surface designed to "prevent[ ] unnecessary accidents." Although some portions of Sika's website are not available to the general public,

Sika's elite contractors, like Bennett, can use it to access all of the product literature for Sika's products. At argument, none of the defendants disputed that Crossgrip was available when the ballpark roof was being replaced, and indeed, the product is mentioned in the warranty materials Sika provided to Bennett at the completion of the project.

¶ 58 Sika went beyond just warning Bennett. It also provided materials to aid Bennett in its obligation to warn the White Sox. The caution sticker Sika included in its warranty materials was clearly addressed to the end users of the roof. It stated in bold letters, "ROOF AND WALKWAYS MAY BE SLIPPERY WHEN ICY, SNOW COVERED, OR WET." The sticker further advised to "LIMIT ROOFTOP ACCESS TO EMERGENCIES" and "PROCEED WITH UTMOST CAUTION" when such conditions were present. It warned users to "CONFINE ROOF-TOP TRAFFIC TO WALKWAYS WHENEVER POSSIBLE." In its cover letter, Sika instructed Bennett, its authorized installer, to forward these materials on to the building owner. It is difficult to conceive of what else a manufacturer, with no direct contact with the building operator or owner, could have done to discharge its duty to warn. Notably, although the Zahumenskys quote Mr. Eheart's statement that if Sika had recommended slip-resistant walking surfaces for worker safety, he would have passed that information on to the White Sox, their lawyer questioned neither Mr. Eheart nor Mr. Esposito about the caution sticker that unequivocally warned of the dangers of slipping on wet PVC.

¶ 59 Because the undisputed evidence demonstrates that Sika adequately discharged its duty to warn, summary judgment in its favor was proper.

¶ 60                                    B. Bennett and the White Sox

¶ 61 We find, however, that summary judgment in favor of Bennett and the White Sox was not proper. Bennett clearly had a duty of reasonable care to the White Sox and the White Sox had a duty of reasonable care to Mr. Zahumensky. There are obvious questions of fact as to whether anyone at Bennett warned the White Sox about the slipperiness of the PVC membrane or offered alternatives to protect workers, and also about the extent to which the White Sox acted in response to such warnings, as well as their own knowledge about how slippery PVC was to walk on. There are also questions of fact regarding the feasibility and effectiveness of various safety alternatives. The defendants point to nothing in the record that suggests these factual issues were resolved in their favor at summary judgment.

¶ 62 The White Sox spend most of their brief arguing that Mr. Zahumensky slipped on a natural, as opposed to an unnatural, accumulation of water and that the White Sox had no actual or constructive knowledge that an unnatural accumulation of water was present on the ballpark roof on the day in question. The "natural accumulation rule" is an exception to the general rule that a possessor of land is liable for physical harm caused to its invitees by known dangerous conditions on the land (Restatement (Second) of Torts § 343(a) (1965)). Under the natural accumulation rule, a landowner has no duty to remove a natural accumulation of precipitation from its property, even if the landowner is aware of the accumulation. See *Watson v. J.C. Penney Co.*, 237 Ill. App. 3d 976, 978 (1992).

¶ 63 But the "condition" that the Zahumenskys allege the White Sox knew or should have known about was not a particular accumulation of water or the presence of "divots" in the concrete roof that might have caused water to accumulate, but the fact that, without walkways or other safety provisions, the PVC membrane was too slippery for workers to safely navigate when *any* amount of water was present. We agree with the Zahumenskys that the presence of

an unusually slippery walking surface sufficiently distinguishes this case from those in which the natural accumulation rule has been applied. The situation is similar to that presented in *Sommese v. Maling Brothers, Inc.*, 36 Ill. 2d 263, 265 (1966), where the plaintiff slipped and fell on a terrazzo entryway not treated with any abrasive material. Our supreme court stated in that case:

> "[C]onsidering the evidence most favorable to the plaintiff, it was a jury question as to whether the defendant knew or should have known that the material used in the composition of the floor, upon becoming wet and damp, became very slippery and dangerous and that the defendant failed to warn the person lawfully on its premises of its unsafe condition. It is this feature of the condition of an outside terrazzo floor which distinguishes this case from those cases in which recovery has been denied as a result of slipping and falling on a wet floor." *Id.* at 266.

¶ 64    This exception to the natural accumulation rule has been applied in a number of other cases. See, *e.g.*, *Fanning v. Lemay*, 78 Ill. App. 2d 166, 173 (1966), *rev'd in part on grounds applicable only to other defendants*, 38 Ill. 2d 209 (1967) ("we conclude that under the pleadings here plaintiff could prove that defendants knew, or should have known, that the asphalt tile, like the terrazzo in *Sommese*, upon becoming wet, became very slippery and dangerous, and failed to warn plaintiff, lawfully on their premises, of its unsafe condition"); *Buscaglia v. United States*, 25 F.3d 530, 535 (7th Cir. 1994) (concluding that questions of fact existed "on the theory that the composition of the floor, either by itself or in combination with an accumulation of water, caused [the plaintiff's] injury"); *Scarelli v. United Parcel Service, Inc.*, No. 10 C 8240, 2011 WL 4738273, at *2 (N.D. Ill. Oct. 3, 2011) (noting that the plaintiff's "allegations [went] beyond the question of whether the method by which the water accumulated was natural or not" and to "the materials used for the floor and coatings," which the plaintiff alleged caused the floor "to become excessively slippery when it was wet").

¶ 65    This is not, as the White Sox insist, a "new theory of liability" raised by the Zahumenskys for the first time on appeal. The Zahumenskys alleged in their complaint that "[a]t all times relevant, the [roof membrane] was slippery when wet," that "defendant, Chicago White Sox, knew the [roof membrane] was slippery when wet," and that, despite this knowledge, it "[f]ailed to provide [Mr. Zahumensky] with a safe place to work," *i.e.*, "[f]ailed to provide a textured slip/skid resistant walkway." Although the complaint also alleged an unnatural accumulation of water to avoid the "natural accumulation" doctrine, it is clear from our review of the record that the focus of discovery was whether and to what extent the various parties knew and attempted to mitigate the inherent slipperiness of the PVC membrane.

¶ 66    We are not persuaded by Bennett's argument that *Hunt* and *Thompson*, the cases relied on by the circuit court, are controlling here. *Hunt* stands for the proposition that "[a]n independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow." *Hunt*, 74 Ill. 2d at 209. "If the contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them." *Id.* In keeping with this holding, our supreme court then concluded in *Thompson* that a contractor had no liability where the detailed contract drafted by the property owner in that case required the contractor to replace a bridge deck "exactly as it had existed." *Thompson*, 241 Ill. 2d at 439, 449.

¶ 67    We agree with the Zahumenskys that these cases are not controlling here because "Bennett was not engaged to blindly replicate the existing roof without input or relevant commercial thought"; rather, the White Sox "sought Bennett's expertise, advice, and direction." This was certainly the White Sox's view of the relationship. In their briefing in the trial court, the White Sox said that they "hired Bennett *** for its expertise and professional judgment and to make recommendations about any safety equipment that might be required or recommended for this type of roof based on *** best practices in the field of roofing installation."

¶ 68    Mr. Eheart and Mr. Esposito engaged in extended discussions, Mr. Eheart submitted multiple proposals to Mr. Esposito before the details of the project were finalized, and Mr. Eheart responded in detail to requests made by the White Sox and the architectural firm it consulted with. Bennett's project manager, Mr. Niggins, made clear that the ballpark roof replacement was not the sort of "bid work" that Bennett now tries to say it was, and that Bennett was not simply handed plans and specifications and told what to do by the White Sox. Mr. Niggins instead categorized the project as "negotiated work"—the type of work in which Bennett would meet with the client to ascertain the client's needs and select the appropriate materials and applications.

¶ 69    In addition, we find no support in the record for the position, taken by Bennett's counsel at argument, that we can conclude on this record as a matter of undisputed fact that the White Sox would have rejected out of hand any recommendation to install slip-resistant walkways.

¶ 70    We also reject Bennett's argument that it had no duty to warn Mr. Zahumensky directly that the PVC membrane would be slippery when wet because that danger was already known to him and was thus "open and obvious." See Restatement (Second) of Torts § 388(b) (1965) (providing that a manufacturer or supplier only has a duty to warn of a danger if it "has no reason to believe that those who use the [product] will realize its dangerous condition"). A warning that slip-resistant walkways were needed would have done Mr. Zahumensky no good. He was not the one with the ability to install or seek approval for the installation of such walkways. That power resided with Bennett's client, the White Sox. Bennett, as an experienced roofing contractor presumed to have familiarity with the products it was installing, had a duty to provide the White Sox with enough information for the White Sox to make an informed decision regarding how to address the slipperiness of the PVC membrane for the individuals the White Sox hired to walk on its roof.

¶ 71    We recognize that although the White Sox were Bennett's client, they did not own the ballpark. Both Bennett and the White Sox were constrained by certain limitations put on the project as a result of the agreement between the ISFA and the White Sox. But we cannot agree, as a matter of law, that Bennett had no duty to at least recommend slip-resistant walkways to the White Sox because it was a mere contractor following someone else's detailed plans. Nor can we conclude, as a matter of law, that the White Sox had no ability to provide safety protection for Mr. Zahumensky. The record indicates that, although they did not seek such approval in 2010 or 2011, when the roof replacement project was underway, the White Sox were able to obtain ISFA approval for Crossgrip walkways in 2014. See *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300-01 (1995) (noting that evidence of subsequent remedial measures is "admissible for the purpose of proving feasibility of precautionary measures where disputed"). Whether the White Sox knew in 2010 and 2011 that such walkways should be installed but failed to request them, or lacked—as a result of Bennett's failure to provide sufficient product information and recommendations—the information it needed to make such

a decision are among the questions of fact that make summary judgment for these defendants improper.

¶ 72                                         IV. CONCLUSION

¶ 73        For the above reasons, we affirm the circuit court's grant of summary judgment in favor of Sika, reverse its orders granting summary judgment in favor of Bennett and the White Sox, and remand for further proceedings consistent with this opinion.

¶ 74        Affirmed in part and reversed in part; cause remanded.